(No. 12933.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EMIL STEINKRAUS, Plaintiff in Error.

*Opinion filed February 18, 1920.*

1. CRIMINAL LAW—*a deputy sheriff should not testify that defendant "admitted" certain things.* A deputy sheriff who examined the accused before the trial should not be permitted to testify that the accused "admitted" that he did certain things which would implicate him but the officer should state what the defendant said, leaving the court and jury to decide whether or not any admissions or confessions were made.

2. SAME—*defendant's statement that he had planned to commit another crime is not admissible.* In a murder trial a police officer should not be permitted to testify to a statement by the defendant that he had planned, with others, to commit a robbery not connected with the crime charged; nor is such statement admissible to corroborate part of a conversation which one of said other persons has testified he had with such defendant, who does not testify in his own behalf.

3. SAME—*ultimate facts must be alleged and proved.* Ultimate facts must be alleged and proved, and the allegations of such facts are the material allegations of an indictment.

4. SAME—*an instruction that every "material fact" need not be proved is not accurate.* An instruction that it is not necessary that the jury believe that every "material fact" in evidence has been proved beyond a reasonable doubt if they believe that every material allegation in the indictment has been so proved is not accurate in using the words "material fact" instead of "incriminating fact;" but the giving of such instruction is not ground for reversal.

5. SAME—*verdict of guilty of murder is sufficient without words "in manner and form as charged in the indictment."* A verdict in a murder trial which recites that the jury finds the defendant guilty of murder means that the defendant is found guilty in manner and form as charged in the indictment though such words are not used.

WRIT OF ERROR to the Circuit Court of Randolph county; the Hon. J. F. GILLHAM, Judge, presiding.

JOHN W. TWEED, and JAMES A. McILWAIN, (A. E. CRISLER, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ALFRED D. RIESS, State's Attorney, and FLOYD E. BRITTON, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error was indicted in the circuit court of Randolph county for the murder of Otis Welshan. In a trial by jury he was convicted of the charge, and the court, after overruling motions for new trial and in arrest of judgment, sentenced him for a term of forty years in the penitentiary. This writ of error is prosecuted to review that judgment.

The deceased, Otis Welshan, of the age of about sixteen years, Otis Lehnherr, of the same age, Lawrence Wylie, of the age of fifteen years, and plaintiff in error, of the age of about twenty years, were all friends just prior to the killing, living in Sparta, in Randolph county, and frequently met at the Lyle pool hall, located in that city. Plaintiff in error worked at that pool hall. The only testimony in the case tending to connect him with the murder in question was that given by two confessed accomplices, Lawrence Wylie and Otis Lehnherr, aforesaid, and James McGuire, the deputy sheriff of said county. Wylie and Lehnherr were both impeached by a number of citizens and business men of Sparta, who testified that they know the reputation of those boys for truth and veracity, that it is bad, and that they would not believe the testimony of either of them on oath. Both Wylie and Lehnherr, previous to the trial of plaintiff in error, plead guilty to the charge of murdering Welshan and were used by the State as witnesses against Steinkraus. Wylie was sentenced to a term of imprisonment in the penitentiary for twenty-five years and Lehnherr was sentenced to serve an indefinite time in the St. Charles Training School. Lehnherr first testified at the coroner's inquest, held immediately after the crime was

committed.  He there admitted his own guilt and implicated
Wylie, but positively testified that Steinkraus had nothing
to do with the murder.

The substance of the testimony of Wylie on the trial
of plaintiff in error is as follows:   On the afternoon of
July 20, 1918, witness had a conversation with Steinkraus
in front of the pool hall, in which Steinkraus asked him
how he would like to make a haul "like we talked about
before," and "mentioned the McNulty and Braden mat-
ters that we had discussed."   After supper witness went
down to the pool room and met Steinkraus in front of it.
Steinkraus told him that he had a date with some girls that
night and for him to see Lehnherr and that Lehnherr would
tell him the plans made that afternoon; that witness was
to meet them between the Mobile depot and Burns' barn
and was to keep Welshan out until Steinkraus got away
from the girls; that he would get away from the girls as
soon as possible.   The witness left Steinkraus and went
up to Hood's and talked to Hood about getting Welshan's
job, as Welshan had quit working for Hood and was go-
ing to St. Louis to obtain another job the next day.   From
Hood's witness went to a drug store, where he met Wel-
shan and talked with him a while.   He afterwards met
Steinkraus at the Candy Kitchen in that town, he being
there with some girls and boys.   The rest of the time be-
fore the killing witness and Lehnherr went from place to
place with Welshan for the purpose of keeping him with
them until Steinkraus should meet them, the last place they
visited being the Mobile and Ohio depot, where they talked
with Somers, the night man.   They left there at 11 :40 P. M.,
and witness fixes this time by the fact Somers looked at
his watch as they were leaving and said that it was 11 :40.
From there they walked up the railroad track a short dis-
tance and then returned to the Burns barn, where the mur-.
der was committed.   There Steinkraus came to them, and
while they were standing looking over a fence and at a

trough there, Steinkraus walked to the southeast corner of the barn, where he had previously told witness he had placed a piece of iron pipe to use on Welshan, got the pipe and came up behind Welshan and hit him with it. Welshan uttered a loud cry but did not fall, and Steinkraus hit him again, knocking him to the ground. Lehnherr got Welshan's pocket-book out of his pocket and all three then left and went to James street, close by, and then turned south. Shortly afterwards Steinkraus said, "We can't let him get out of here," and all of them went back. They found Welshan on his feet, staggering about, and Steinkraus, while standing in front of him, took hold of him with both hands and said to witness, "I will hold him; get the pipe down at the corner." Witness then got the same iron pipe and struck Welshan over the head with it. Welshan went down, and then he and Steinkraus both beat upon the head of Welshan, Steinkraus kneeling over and hitting Welshan with a stone while witness used the iron pipe. On the body of Welshan they found a pocket-book and a picture of his mother. Steinkraus gave witness and Lehnherr each $10 of Welshan's money and kept the rest for himself, he did not know how much. They left Welshan dead, separated a short distance from there and all went home. Lehnherr's part in the conspiracy to rob Welshan was that he and Steinkraus planned it and Lehnherr was to tell Wylie about the plan. The plan was that Steinkraus would take his gun and make Welshan "hand it over."

Lehnherr, in his testimony at the trial, corroborated Wylie in the main part of his testimony against Steinkraus but denied positively that he got any of the money of Welshan, denied taking the pocket-book off Welshan, and testified positively that he absolutely knew nothing about the murder or holdup, or that there was to be such, until the first time that night they went to the barn. He also testified that they all agreed that night that they would not tell on each other, and gives that as a reason why he did not testify against

Steinkraus at the coroner's inquest, and as a further reason that Steinkraus threatened him with violence in case he should tell on him.

Both Wylie and Lehnherr fixed the time of the killing at about the same time,—a little after 12 o'clock that night;—but neither of them knew exactly what time it was committed. The State also proved that Wylie was arrested by the city marshal of Sparta the next day after the murder. He found the pocket-book of the deceased in the mattress of his bed where Wylie had hidden it, and it had $14 in it. To this officer Wylie confessed he was with Lehnherr and Steinkraus when Welshan was killed. He implicated Lehnherr and Steinkraus, denied hitting Welshan and claimed that Steinkraus did the killing. Wylie was found with a bloody handkerchief, and he said that the stains were made by paint. There were blood spots also on his collar and tie, and there was a great deal of blood on the front part of his shirt. A stone was found next morning near the body of Welshan with fresh blood and hair on it.

Plaintiff in error denied to the marshal that he met Wylie and talked over the plan of robbing Welshan, and at all times denied the charge that he had anything to do with the robbery and murder of Welshan. He did not testify at his trial but did at the preliminary hearing. He testified there that as he went home that night, near midnight, he traveled on a street running close by the scene of the murder and saw two boys running around the barn as he passed it. This street was on his direct route home, and he testified at the preliminary hearing that he went from Mrs. Ida Hetherington's house direct to his home. His clothing had no blood-stains or other evidentiary marks connecting him with the killing when arrested.

Mrs. Ida Hetherington testified for the plaintiff in error that he left her house for his home fifteen minutes before 12 o'clock. She fixed the time definitely by reason of the fact that she set the alarm clock for Rose York at that

time, who was a dining room girl at the Broadway Hotel
and one of the girls that plaintiff in error was with that
night. His grandmother, Mrs. Gosnell, testified that he came
home that night just a few minutes before 12 o'clock, and
that she knew that because the clock struck 12 when he
got up-stairs. In rebuttal, a witness for the State testified
that Mrs. Gosnell told him that plaintiff in error went to
bed that night about 11:30.

Ross Malone testified, in substance, as follows: Witness
went to the billiard hall on the night of the murder, where
Steinkraus was at work, and asked William McHenry, the
manager, if Steinkraus could get away for the night if he
would get Jake Striker to work in his place. McHenry re-
plied that he could. Malone then brought Striker. At the
same time he asked Steinkraus if he would go with him,
and informed him that he had an extra girl that he wanted
him to go with. He fixes this time definitely at twenty-eight
minutes to 10 o'clock, or twenty-eight minutes of quitting
time for Steinkraus. He testified positively that he knew
that Steinkraus had no previous engagement for that night,
as the girl Steinkraus was with had never been in Sparta
before. Several boys and girls were with witness and Stein-
kraus that night after they left the pool room until Stein-
kraus left Mrs. Hetherington's for his home. He pointed
out to Steinkraus the girl that he wanted him to go with,
the girls then being on the sidewalk in front of the pool
hall, and Steinkraus agreed to go with her. From there
they went to the show, from the show to the Candy Kitchen,
then to Mrs. Hetherington's. The other members of this
crowd were Mrs. York, Anna Houston, Elizabeth and Rose
York, a little Hetherington girl and Meril Reed. Malone
is corroborated in detail by Rose York, Anna Houston and
Elizabeth York, who were witnesses for plaintiff in error.
Rose York testified specifically that Malone said to her as
they were out walking, "Don't you think one of the girls
would go with Steinkraus?" She asked one of the girls

if she would go with him, and her reply was that she would. They then went to the pool room and Steinkraus joined them. The girl that Steinkraus went with was Anna Houston, and she testified that she had never met Steinkraus until that evening when she met him at the pool room; that she had no previous engagement with him; that she had never been in Sparta before, and that as they went to Mrs. Hetherington's Steinkraus stopped at the pool room and bade somebody good-by. They all corroborated Mrs. Hetherington as to the time Steinkraus left her home.

William McHenry corroborated Malone and Miss Houston, and his testimony, in substance, is as follows: Witness was manager of the pool hall for Lyle & Lyle and Steinkraus was employed under him until that evening; that Steinkraus had notified him a week or more before that he was going to his home in Missouri; that on that evening he came in and bade him good-by; that he met him and Malone and their crowd about 11:35 o'clock that night at the public school building as witness went home, and that Elmer Scully and Edgar Loyd were with him when he met them. Scully corroborates this witness as to his meeting with Malone, Steinkraus and the other parties with them at 11:30 or 11:35. It also was shown by the testimony of these witnesses, and of Wylie, too, that Wylie saw Steinkraus with this party of boys and girls at 10 o'clock or later.

C. M. Allen, mine clerk of the Moffat Coal Company, testified that he lived close to the Burns barn,—one street and one lot west of it,—and is familiar with its location; that about 11:30 o'clock on the night of the murder he was sitting in his front room, reading, when he heard a loud cry, whether of fright or of pain he could not tell; that he got up and went out on his kitchen platform to see what had happened; that he saw two boys or young men coming from Jackson street and turn into James street, south; that they hesitated a moment and one of them said, "Let's go back;" that those were the only words he could

understand; that they went back on James and Jackson streets, around the barn and out of sight; that in about five minutes the same two boys came from Jackson into James street again and went south to the M. & O. or I. S. railroad tracks; that there they went east on the tracks, and that he watched them until they got to the knitting factory, on St. Louis street, the next street east of James street. He further testified that he could see quite clearly the two boys or young men but could not recognize them; that there was a light on the water tower near there and that there was a light at the intersection of Jackson and James streets on a telephone post, and that he did not at any time see a third party with those boys.

We shall not pass on or discuss the merits of this case from the evidence in the record. It is apparent that under the evidence already recited it was very necessary that all the instructions be accurate and the record free from other prejudicial error. James McGuire, deputy sheriff of said county, was permitted by the court to testify, over the objection of plaintiff in error's counsel, that plaintiff in error "admitted" in one of several examinations that McGuire and others had subjected him to, that he and Wylie had planned "to hold up Mr. Braden," and that for that purpose they were going to use plaintiff in error's gun that he got out of the billiard hall; that for this purpose they walked down to the barber shop and Wylie from there went on down to see a Burk boy; that Wylie made some excuse, after he came back, to get away and never showed up any more. He also testified thus: "Then he [plaintiff in error] admitted they were going to rob an old gentleman up there by the name of McNulty,—an old soldier,—going to hold him up with a gun and Wylie was to go through him." He further testified that plaintiff in error "admitted that he saw him [Wylie] that afternoon [the afternoon preceding the murder] and then saw him in the billiard hall standing by the big glass there and that they had a conversation."

His examination by the State's attorney further proceeded in this manner: "I will ask you whether or not he was asked the question if he [Steinkraus] would hold up a man with a gun and rob him, and what his response was," and he answered, "Yes; said yes."

Most all of this testimony is objectionable, in the first place, because the witness was permitted to state mere conclusions. He should have only been permitted to state exactly, as nearly as he could remember, what the defendant said that the witness interpreted as an admission or confession, and let the court and jury be the judges whether or not any admissions or confessions were made by plaintiff in error. Plaintiff in error did not testify and was placed in a very embarrassing position to testify by the foregoing examination. If he had testified and denied on the trial that he had had any conversation whatever with Wylie on the afternoon in question, it would have been proper to prove by McGuire that plaintiff in error told him that he did have some conversation with Wylie that afternoon, repeating the words to the jury, as nearly as the witness could, which plaintiff in error used in such statement. But a mere statement by plaintiff in error that he did have a conversation with Wylie on that afternoon, although proper to prove it, should not be characterized as an admission. It was but mere corroboration of Wylie to the effect that plaintiff in error did have a conversation with him at about the time he testified that plaintiff in error asked him to join him in the hold-up and robbery. Whether the conversation was incriminating or otherwise does not appear because of his failure to state it. The jury were left to speculate as to what plaintiff in error did say.

The testimony of McGuire to the effect that plaintiff in error had admitted to him or stated to him that he and Wylie had planned to hold up the two men above mentioned was absolutely irrelevant and improper and very prejudicial to plaintiff in error. It is well settled by the

decisions of this court that where one is charged with mur-- der or robbery it is improper to introduce proof of other murders or robberies to establish the crime of which he is charged. In other words, proof of other crimes is not admissible to establish another crime that is entirely distinct and separate from the others. There are some cases where such proof is admissible for the purpose of showing intent, but this case does not come under that rule at all. If plaintiff in error in this case be proven to have taken part in this horrible murder there could be no possible question about intent or guilty knowledge on his part.

The admission or statement of plaintiff in error testified to by McGuire, to the effect that he (Steinkraus) would hold up a man with a gun and rob him, was of the same objectionable character. All this objectionable evidence was offered by the State's attorney, as he stated to the court, for the purpose of corroborating Wylie. It was not admissible as corroboration. It was simply proof offered of confessions of the plaintiff in error that he had contemplated and had undertaken to commit other crimes which were thwarted in the manner above stated, and proof of a further admission that he would hold up a man with a gun and rob him if a favorable opportunity offered. Whatever words, if any, plaintiff in error used to Wylie on that afternoon to convey to Wylie his meaning of what he wanted Wylie to do to Welshan in the plot to rob and kill him were admissible and were properly testified to by Wylie, no matter if those statements did make reference to other attempted crimes, but it should have gone no further than the very words that Steinkraus used to Wylie on that occasion. It was not proper to prove that they, in fact, did attempt such hold-ups or that Steinkraus admitted or stated that he had done so, or that he would do so again if opportunity offered.

Complaint is made of the action of the court in giving instruction No. 12 for the People, to-wit:

"It is not necessary that the jury should believe that every material fact or circumstance in evidence before them has been proven beyond a reasonable doubt, but that it is sufficient if the jury believe from the evidence in the case that every material allegation in the indictment, in manner and form as therein charged, has been proven beyond a reasonable doubt."

The instruction would have been absolutely correct in form if instead of the words "material fact" the court had used the words "incriminating fact." Facts are of two kinds: ultimate facts and evidentiary facts. Ultimate facts must be alleged and proved, and the allegations of such facts are the material allegations of an indictment. We do not approve entirely of the use of the word "material" in the above instruction, but we have held that by the use of the words "material fact" a jury would only understand, when the words are used in such an instruction, that the law does not require every incriminating fact and circumstance to be proved beyond a reasonable doubt. (*People* v. *Grove,* 284 Ill. 429.) For that reason the giving of instructions similar to the foregoing instruction has been held by us to be harmless error. To prevent any possible misunderstanding by a jury we would be much better satisfied if the word "incriminating" were used instead of the word "material" in such instruction.

The verdict of the jury was in the following language: "We, the jury, find the defendant, Emil Steinkraus, guilty of murder, and we find his age to be about twenty years, and we fix his punishment at forty years' imprisonment in the penitentiary." The verdict was in conformity with one of the forms of verdict given by the court. It is objected that the verdict of the jury is not responsive to the issues and is insufficient to support the judgment. The full and complete form of the verdict would require after the word "murder" in the above form of verdict, the insertion of the words "in manner and form as charged in the indictment."

That is just what the foregoing verdict means and could not reasonably be otherwise construed, and the verdict as rendered was sufficient. *Armstrong* v. *People,* 37 Ill. 459; *Bond* v. *People,* 39 id. 26.

One other error assigned cannot be sustained by the court but it is not proper to discuss it here. There were also other errors assigned which are not material to this consideration and are not likely to arise on another trial and are therefore not considered.

For the error in the admission of evidence, as above indicated, the judgment of the circuit court is reversed and the cause is remanded.            *Reversed and remanded.*