(No. 15773.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN MEISNER *et al.* Plaintiffs in Error.

*Opinion filed February 19, 1924.*

1. CRIMINAL LAW—*when evidence of other offenses is not admissible.* Although evidence which tends to prove the offense charged is not objectionable merely because it discloses other offenses, the test of admissibility is the connection of the facts proved with the offense charged; and the fact that one man, or two or more in conjunction, committed a series of separate, unconnected crimes does not, on a trial for one of the crimes, authorize the admission of evidence of all or any of the others.

2. SAME—*what evidence is not competent in rebuttal.* Where the defendant testifies to an immaterial fact and the State's attorney does not object, the People cannot, for the purpose of contradicting the immaterial testimony, introduce evidence in rebuttal which injects into the case proof of another crime which has no connection with that for which the defendant is being tried.

3. SAME—*what does not show defendant aided or abetted the crime.* Where several defendants are being tried for a murder committed during a robbery, evidence that one of them, who was not present at the robbery, in response to a statement by one of the others, prior to the robbery, that they were going out to get some "dough," replied, "I need some dough, too; when you get a good sock of dough let me take it," cannot, alone, be regarded as proving that said defendant aided, abetted, assisted, advised or encouraged the perpetration of the crime.

4. SAME—*judgment must be reversed where incompetent evidence prejudices jury in fixing penalty.* A defendant has the right to have his case tried on competent evidence applicable to the crime for which he is tried and to have the penalty fixed with reference to that crime, alone, and where evidence of other offenses not connected with the crime charged is of such character as necessarily to prejudice the jury against the defendant in fixing the penalty for his crime, the judgment must be reversed even though the competent evidence proves the defendant's guilt.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. PHILIP L. SULLIVAN, Judge, presiding.

O'BRIEN, PRYSTALSKI & OWEN, and SHORT & GUENTHER, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and GEORGE C. DIXON, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

John Meisner and James Hunter were indicted, jointly with Harold Splitt, for the murder of Joseph Schlessinger. Splitt entered a plea of guilty and testified on the trial of the other two. They were convicted. Meisner was sentenced to death and Hunter to imprisonment for life, and they have sued out a writ of error.

Schlessinger was a taxicab driver in Chicago and was hailed by Meisner on the night of February 6, 1923, about midnight, at Fifty-fifth and Halsted streets. Meisner and Splitt got into the taxicab as passengers. Meisner had a .32-20 Colt revolver and Splitt a .45 automatic. Both belonged to Hunter. They drove east to a short distance west of Normal avenue, when Meisner got out on the running-board, put the revolver he had to the driver's chest and told him to stop and put up his hands. He did so. Meisner got out of the cab and stood beside it. William Mandell, the driver of another taxicab, saw Schlessinger's taxicab standing there, apparently in trouble, with the driver and two men standing beside it. Mandell stopped, got out of his car and walked toward Schlessinger. When he got within a few feet of the car he noticed that Schlessinger had his hands up and heard Meisner order Splitt to get Mandell and get him good. Splitt ran to Mandell, covered him with his revolver, made him get into his cab and ordered him to drive to a dark street. He drove east to Princeton avenue, then south to Fifty-sixth street, west to a north and south alley, into which he drove south about one hundred yards, where Splitt ordered him to stop, put out his lights and put up his hands. Splitt then took his

money,—several dollars,—tied his hands to his belt, told him to get into the cab, broke out the dome light of the cab and went home. Mandell quickly got loose and reported to the police. In the meanwhile two police officers going south on Racine avenue, when about fifty feet past Forty-ninth street, heard a shot fired, which they located to the south. They ran in that direction and saw a crowd gathered at the southeast corner of Fiftieth street and Racine avenue. Schlessinger's cab was standing on Racine avenue a few feet south of the corner and Schlessinger was lying on his back on the street a few feet from the cab, having been shot in the chest, the ball going through his heart. He was still breathing and was put in the cab and taken to the hospital, where he died within a few minutes. The policemen went through an alley to the rear of No. 5009 Racine avenue, where they saw Meisner ahead of them walking fast towards Racine avenue and ordered him to halt. He did not do so but the officers caught him on the sidewalk. He did not have the revolver then. There was snow on the ground and the officers searched for the revolver at that time and for the next two days. It was eventually found on February 9 by a boy, who hid it under the sidewalk and afterward showed it to a policeman. It had one empty and five loaded shells. The belt from Meisner's coat was found near the cab.

Splitt testified to the hold-up of Schlessinger's cab by Meisner. Mandell identified Meisner as the man with the pistol, and the evidence leaves no doubt of Meisner's guilt.

Testimony was introduced to show Meisner's actions during Monday and Tuesday, and it appears that Tuesday night he went to the house of his grandmother, at 5319 Emerald avenue, with Splitt and George Myers. They had been drinking moonshine whisky before that and Meisner was under its influence when he came. They drank more while they were in the house and left some time after 11:00 o'clock. Meisner testified on the trial that he did not re-

member what time he left his grandmother's house or any-
thing that happened after he left; that the next thing he
remembered was that he was over at the stock yards police
station.   He was twenty-seven years old and had served in
the army on the Mexican border and afterward in France,
where he was in continuous active service at the front.   He
testified to some of the details of this service, the long
period of fighting and the hardships endured, the fact that
he was taken prisoner and escaped, but having no gas mask
was gassed and was in the hospital.   There was testimony
as to his broken health physically after his return and as
to peculiarities in his conduct, but the evidence was not such
as to justify a finding that there was clearly a reasonable
doubt as to his soundness of mind and appreciation of the
criminality of his acts.   The verdict finding him guilty can
not be disturbed because it was not amply sustained by the
evidence.   The extreme penalty was imposed by the jury
in fixing his punishment, and error was committed in the
admission of evidence of such a character as to require a
reversal of the judgment.   Over the objection of the plain-
tiffs in error the State's attorney was permitted to prove
by George Myers that on Monday night, which was the
night before the murder, he and Meisner, at Seventy-first
street and Racine avenue, held up a man at the point of a
revolver and robbed him of $28; that on the same night
Meisner, Splitt and Myers held up another man at Sixty-
fifth and Honore streets and robbed him of $2, and that
on the same night Meisner, Splitt and Myers committed a
burglary by entering the saloon of Joe Milewski after it
was closed, through a window, and stole several boxes of
cigars from the saloon.

Hunter was thirty-one years old.   He lived with his
mother at 6236 Seeley avenue and conducted a roadhouse,
called the Hillside Inn, at Ninety-fifth street and Eighty-
eighth avenue, at which Meisner and a woman named Fran-
ces Wilson were employed.   On the night of Sunday, Feb-

ruary 4, Hunter, Splitt, Myers and a number of others were in Joe Milewski's saloon, at Sixty-third and Lincoln streets, shooting craps. Splitt and Myers testified about what occurred there and the subsequent doings of themselves, Hunter and Meisner for the next two days. Hunter, Splitt and Myers all lost their money playing craps at the saloon Sunday night, and Hunter borrowed $20 from the keeper on a diamond pin which he pledged and then lost the $20. They left between 10:00 o'clock and midnight. The next morning the three, together with Charles Coles, went in Hunter's Ford coupe to Ryan's car shop, where the three, except Hunter, applied for employment and obtained it, to begin the next morning. Splitt and Myers returned to Hunter's home in his coupe and remained there, while Hunter occupied himself during the rest of the forenoon going to various places in the coupe attending to his business. In the afternoon Hunter, Splitt and Myers went to the Hillside Inn and got Meisner, who was at work there, and Hunter's two revolvers, and came back to Meisner's house, where all four sawed some wood for Meisner's father. Afterward, about 6:00 o'clock, Hunter drove the four to Myers' home, at Sixty-fifth and Justine streets, and left Myers there, then to Splitt's home, at Sixty-fifth and Seeley, and left Splitt there, and then to a grocery store at Sixty-third and Winchester, where he left Meisner, and then drove to his own home. He testified that he had supper about 6:30, then drove to the home of a Miss Palermo and brought her to his home at his mother's request, where the three remained until about 11:00 o'clock, when he took Miss Palermo home and returned to his own home and went to bed. Myers, however, testified that about 7:00 o'clock that night Hunter drove him and Meisner to Seventy-first street and Racine avenue and left them there, and that after walking around the streets awhile they held up a fellow. After holding up another man at Sixty-fifth and Honore, from whom they got $2, while they were waiting for Milewski's saloon to

close, they returned to the saloon and robbed it. They then went to Hunter's house a little after midnight and saw him on his back porch. Myers spent the rest of the night at Meisner's house. During the afternoon of the next day Meisner and Splitt telephoned to Hunter and asked him to come to Meisner's house. Hunter went there while they were at supper and after supper took the three men in the coupe to Sixty-third street and Lincoln avenue, where the three got out and went to the house of Meisner's grand-mother. They had had several drinks of moonshine whisky at Meisner's, and Meisner and Splitt also drank it at Meisner's grandmother's, but Myers was sick and did not drink any. They left the grandmother's house about 11:00 o'clock, and Myers, being sick, left Meisner and Splitt at Fifty-third and Halsted streets and went home. Myers gave no testimony tending to show any conspiracy among any of the men to commit any crime.

Splitt testified that on the way back from the Hillside Inn on Monday afternoon Hunter said he would like to get back the pin he pawned; that they could make the saloon that night. He talked about going to the saloon and getting that pin. Splitt further testified that he and Myers met at the saloon about a quarter to 9:00 o'clock that night and walked over to Sixty-third street, between Winchester and Lincoln, where they met Meisner, and the three agreed to go out and hold somebody up, and Meisner held up a fellow; that they went to Hunter's house about 11:30. Hunter was there and told them they should go to the saloon and get his diamond pin and the dough and told Splitt to take the automatic .45 pistol. Splitt declined because he did not know how to handle it. Hunter said he was yellow, and gave it to Meisner, who gave it to Myers. The three went to the saloon and entered it, stealing four boxes of cigars and cigarettes and two watches, and then went back to Hunter's and talked with him on the back porch. Meisner gave him the cigars, and Hunter told him they should

go back and see if they could get the pin. They had gone into the saloon through a window. Myers told Hunter there was a key in the door leading up-stairs, where Milewski kept his money. Hunter got his knife and wanted them to get the key out so that a skeleton key could be used, but they did not go back. Splitt went to Meisner's house about 10:00 o'clock the next morning. Meisner and Myers were still in bed. They had the two pistols there. They sat around and drank moonshine all day. They telephoned to Hunter, and he came over about 6:00 o'clock in the evening. They went out in the coupe and Hunter had a talk with Meisner, in which Meisner said that he needed some dough and they were going out to get some dough. Hunter said: "I need some dough, too; when you get a good sock of dough let me take it." At Sixty-third street and Hoyne avenue the three left the coupe, and Meisner told Hunter he would see him later. They went to Meisner's grandmother's and Myers went home later, and Meisner gave Splitt the .45 automatic.

Hunter testified to his purchase from Lauder Bros. of the coupe which he had, and put in evidence the bill of sale and other papers relating to it. After laying the foundation for it in the cross-examination of Hunter, over objections of the defendants the State's attorney introduced in rebuttal evidence to show that the body of the coupe had been damaged on January 1, 1923, by an accident in which Hunter's brother had been killed; that the Rev. M. H. Cloud, pastor of the West Pullman Methodist church, left his Ford coupe in front of the church, at Sixty-fourth and Paulina streets, during the evening services and someone took it; that the body of his coupe, which he identified, was the body which was on Hunter's coupe at the time of the arrest. In rebuttal, Splitt testified also that on January 3, 4 or 5 Hunter and himself and some others stole a car from in front of the church and the body was taken from it and put on Hunter's car. Alvin Piper testified that

on January 23 the change of the bodies was effected at his garage in Oak Lawn by Hunter and others. Meisner's name was mentioned as being one who helped steal the car. The answer in that respect was stricken out.

All this evidence was incompetent and had nothing to do with the murder of Schlessinger, for which the defendants were on trial. The crap game Sunday night, the proceedings of the defendants and Splitt and Myers on Monday and Monday night, the two hold-ups that night and the burglary of the saloon, were entirely disconnected with the murder which Meisner committed, in conjunction with Splitt, on Tuesday night. The tendency of the evidence of these facts was to show that the defendants were bad criminals; that they were prepared to commit, and had committed, violent crimes, but no one of the crimes had any tendency to throw any light on the one which was the subject of investigation on this trial. The fact that one man, or two or more in conjunction, committed a series of separate crimes does not, on a trial for one of the crimes, authorize the admission of evidence of all or any of the others. The rule is universal that the evidence on a trial must be confined to the question in issue, and the fact that two men committed a robbery on Monday night at Sixty-third and Winchester streets is not competent evidence in the trial of one of the men and another for a murder committed on Tuesday night at Fiftieth street and Racine avenue, where no connection is shown between the crimes. A man can not be convicted of crime because he is a bad man generally or has committed other crimes for which he has not been punished, though evidence which tends to prove the offense charged is not objectionable merely because it discloses other offenses, the test of admissibility being the connection of the facts proved with the offense charged. *Farris* v. *People,* 129 Ill. 521 ; *People* v. *King,* 276 id. 138; *People* v. *Lane,* 300 id. 422; *People* v. *Hall,* 308 id. 198; *People* v. *Spaulding,* 309 id. 292.

The evidence in regard to the stealing of the preacher's Ford coupe was immaterial. The evidence which Hunter gave in regard to his purchase of the Ford coupe was not material, but it was not objected to by the State's attorney and its admission did not authorize the introduction of evidence to contradict the immaterial testimony and thus introduce into the case evidence of another crime which was not competent. *People* v. *Newman*, 261 Ill. 11.

There is no evidence except that of the two confessed criminals, Splitt and Myers, that Hunter had any knowledge of their crimes or their criminal purposes, and they do not testify that he was present when any of the crimes were committed except the stealing of the automobile, for which he was not on trial. The several robberies testified to, except Splitt's robbery of Mandell, were all separate and independent crimes having no connection with the hold-up and murder of Schlessinger. Splitt's testimony tends to show that Hunter advised and encouraged the burglary of the saloon but not any of the other robberies. The revolvers with which Meisner and Splitt held up Schlessinger and Mandell belonged to Hunter, but the evidence does not show that they were given to them to be used for such a purpose. They were brought in from the Hillside Inn on Monday before the burglary of the saloon, but if they were intended for use on that occasion there is no evidence that Hunter contemplated their use for other independent crimes or that any other independent crimes would be committed. Splitt testified that Meisner told Hunter in the coupe that he needed some dough and they were going out to get some, and Hunter said, "I need some dough, too; when you get a good sock of dough let me take it." If Meisner's remark can be regarded as notice to Hunter that Meisner was going to commit a robbery, Hunter's answer was not aiding, abetting, assisting, advising or encouraging the perpetration of the crime.

Even if it could be said that so far as Meisner is concerned the evidence that he was guilty of murder was so complete that without regard to the incompetent evidence there could have been no other verdict than guilty, it can not be said that the evidence was not prejudicial as to him. The jury had the right to fix the penalty, and they did fix it at the extreme limit authorized by law. Nobody can know what the jury would have done if they had fixed the penalty on the evidence of this crime alone. It is not for us to say what they ought to have done. The defendant had the right to have his case tried on competent evidence applicable to the crime for which he was tried and to have the penalty fixed with reference to that crime, alone, without having all his evil deeds submitted to the consideration of the jury in fixing the penalty for this one crime. *Farris* v. *People, supra; People* v. *Lane, supra.*

Instructions 10 and 11 given for the People were abstract propositions of law on the subject of conspiracy and the liability of each conspirator for the acts of all. Instruction 12 was an instruction on the same subject which did apply the law to the facts as the People claimed them. The other instructions would only tend to confuse the jury and should not have been given.

Three instructions as to the defense of alibi were asked by the defendants and refused. They were not applicable to the facts of the case. No alibi was claimed for Meisner, and the prosecution did not claim that Hunter was present at the actual homicide. He was sought to be held as an accessory or conspirator. The instructions applied to the ordinary case of absence from the place at the time of the actual commission of the crime and were properly refused.

For the errors in the admission of evidence the judgment is reversed and the cause is remanded.

*Reversed and remanded.*