(No. 18682.—
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CATHERINE CASSLER, Plaintiff in Error.

*Opinion filed October 25, 1928.*

WILLIAM W. WITTY, (CLYDE C. FISHER, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and ROY D. JOHNSON, (JOHN HOLMAN, and E. E. WILSON, of counsel,) for the People.

Mr. CHIEF JUSTICE DeYoung delivered the opinion of the court:

Catherine Cassler, Loren Patrick and Lillian Frazier, who was also known as Lillie Lindstrom, were jointly indicted in the criminal court of Cook county for the murder on December 6, 1926, of William Lindstrom, otherwise known as William Tunyea. Pleas of guilty were entered by Loren Patrick and Lillian Frazier and they were sentenced to imprisonment in the penitentiary for life. Catherine Cassler's plea was not guilty. A jury returned a verdict finding her guilty and fixing her punishment at death. Motions for a new trial and in arrest of judgment were denied and judgment was rendered on the verdict. This writ of error is prosecuted for a review of the record.

Catherine Cassler, the plaintiff in error, her husband, Dormand Cassler, and her son, Edward, formerly lived in Chicago. In 1924 Mrs. Cassler and her husband purchased a home in Hebron, Indiana. The husband was employed in Chicago by a firm engaged in the business of moving, and he returned home at the end of each week. On November 19, 1926, plaintiff in error and her husband moved to Crown Point, Indiana, where they rented a house. This change was made because Crown Point was more accessible to the husband's place of employment and afforded superior educational advantages for the son. Loren Patrick lived with plaintiff in error and her husband both at Hebron and Crown Point, except for a period of two months in the spring of 1926 when he served a sentence at the State penal farm at Greencastle, Indiana, for a violation of the Prohibition law. He assisted plaintiff in error about the house and garden, cared for the chickens, sold eggs and drove an automobile owned by plaintiff in error. He also worked for neighbors and occasionally was employed at a grain elevator. During the period of Mrs. Cassler's residence in Chicago she became acquainted with Lillian Frazier, the

wife of Joseph C. Frazier. Frazier and his wife kept a boarder, William Tunyea, who was a cabinet maker and furniture finisher. In October, 1922, Mrs. Frazier left her husband and thereafter lived with Tunyea, who assumed the name of Lindstrom. They lived together as husband and wife at several different addresses on the south and west sides in Chicago, were separated for a short period, and in July, 1925, moved into a basement apartment at 2114 West North avenue, where they resided until Lindstrom's death.

Lillian Frazier, who pleaded guilty, was called as a witness by the prosecution. The substance of her testimony follows: While living with Lindstrom she met her husband three or four times a week on street corners. She told him that she was employed as a nurse. She had grown tired of Lindstrom, however, and wanted to leave him. While she lived on West North avenue plaintiff in error came in response to a letter from her and she asked plaintiff in error how she could be freed from Lindstrom. Plaintiff in error answered, "Between the two of us we ought to find a way." Returning at a later time, plaintiff in error brought a package which she said contained poison and suggested that Mrs. Frazier put it in Lindstrom's food. The package was never opened. After this conversation plaintiff in error inquired whether Lindstrom was insured, and when the policy was shown to her she said she was acquainted with a man who for a few hundred dollars would be willing to kill Lindstrom and make his death appear as the result of an accident so that the insurance could be collected. Mrs. Frazier first met Patrick prior to the time she moved to West North avenue. She discussed with him and plaintiff in error different plans for the murder of Lindstrom. One involved the hiring of a taxicab, the murder of the driver as well as of Lindstrom and the placing of the two bodies in the cab, which was then to be driven upon a railroad track in the way of a train approaching at high speed in

order to make it appear that the deaths were accidental. This plan was abandoned because plaintiff in error did not approve it. Another plan proposed by Patrick required him to strike and kill Lindstrom with an iron pipe and remove his body to some point under an elevated railway structure so that it might appear that he had been struck by an automobile. The preliminary details of this plan were carried out, but Mrs. Frazier failed at the opportune moment to release Patrick from the pantry in her apartment, where he was concealed, to the kitchen, where Lindstrom was present, and the plan was not consummated.

On December 6, 1926, Mrs. Frazier met Patrick and plaintiff in error between 4:00 and 4:30 P. M. in the latter's automobile, a short distance west of 2114 West North avenue. During the course of the conversation Patrick insisted that the plot to kill Lindstrom should be carried out that night. Lindstrom wanted to sell his furniture, and it was suggested that Patrick represent himself as a farmer from Michigan who had sold his farm and desired to buy furniture. It was arranged that when the opportunity was afforded, Mrs. Frazier, upon a signal from Patrick, should give him the iron pipe and that he would then strike and kill Lindstrom. Mrs. Frazier returned to her apartment and gave Lindstrom an evening newspaper. Later she again met Patrick and plaintiff in error, the plot to kill Lindstrom was further discussed, and she returned to her apartment the second time. She found Alvie Grigolini, the janitor's son, present, and he remained until 9:30 P. M. Patrick called on the telephone during Grigolini's visit and Mrs. Frazier answered that she had company. Later Patrick telephoned again, stating that he was coming to examine the furniture. He came about 10:30 P. M. and Mrs. Frazier admitted him. Lindstrom asked Patrick whether he desired to buy a single piece or all of the furniture. Patrick answered that he wanted all of the furniture; that he would look at it and return in the morning with his wife,

who also wished to see it. Lindstrom went from the living room to a hall and Patrick followed. As they reached the hall Patrick signaled for the pipe. Mrs. Frazier gave it to him and he hid it under his overcoat. Lindstrom, exhibiting his furniture to Patrick, proceeded first to the bed-room, then to his workshop, which was a room in the same apartment, and finally returned to the living room. He took Patrick back to the bed-room and showed him a small commode. The top drawer of the commode was caught, and while Lindstrom was bending over it, Patrick, according to his testimony, struck Lindstrom on the head with the pipe and the latter fell to the floor. In a few moments Mrs. Frazier asked him where plaintiff in error could be found, and he told her in the automobile, a few doors west. She went to the car and informed plaintiff in error that the crime had been committed. Both women returned to the apartment, and after some discussion plaintiff in error directed Patrick to drive the automobile to the rear of the building. After complying with the request plaintiff in error remarked that Lindstrom's body should be removed, since it was getting late. Patrick covered the body with a blanket, and, with the assistance of plaintiff in error and Mrs. Frazier, carried it to the automobile and placed it on the floor of the car. Mrs. Frazier gave Patrick the iron pipe and the latter and plaintiff in error drove away. About 5:30 A. M., December 7, Mrs. Frazier telephoned the police that Lindstrom had left the apartment about 10:30 o'clock the previous evening to go to a drug store and had not returned. Less than an hour later she went to the North Avenue police station and again reported Lindstrom as missing. Shortly after her return to her apartment a police officer called and inquired whether it was Lindstrom's residence, and when she answered in the affirmative and gave him a description of Lindstrom, the officer informed her of the finding of a body in an alley and asked her to accompany him to the police station. She went to the station

and later was taken to an undertaking establishment, where she viewed the body and identified it as Lindstrom's. She was released by the police officers upon her promise to return at a certain time. She failed to appear as promised. On the morning of December 9 she met her husband, Joseph C. Frazier, who bought her a railroad ticket to Crown Point, Indiana. Upon reaching her destination she went to the home of plaintiff in error but found no one present. She gained entrance by the use of a skeleton key, and shortly thereafter Patrick and Edward Cassler, the son of plaintiff in error, appeared. Mrs. Frazier remained all night, and about noon of the next day, plaintiff in error, who had gone to Chicago, returned home. The two women discussed the trip of Patrick and plaintiff in error to Crown Point after the killing of Lindstrom, the disposition of the iron pipe and the blanket, the possibility of finger prints, the report of Lindstrom's absence by Mrs. Frazier, and the necessity of preventing her discovery. On Saturday morning, December 11, Patrick and the women drove to the home of Ed Rice, at Hebron, Indiana. Plaintiff in error introduced Mrs. Frazier as Nellie English, of Denver, Colorado, whose home had been burned and who was desirous of employment, even at low wages. Mrs. Frazier worked for Rice one week. During that week plaintiff in error and Patrick called to see her four or five times. On one of these occasions plaintiff in error brought her some black material in order that she might re-trim a red hat which she had worn and thereby enable her to prevent identification. At another time plaintiff in error delivered a letter from her husband and $20 which he had sent. When her employment in Hebron ended she returned to Chicago, and on December 21 called at the North Avenue police station, where she was taken into custody.

Mrs. Frazier testified that there was no understanding or agreement that plaintiff in error would share in the proceeds of the insurance policy on the life of Lindstrom. It

appeared from the evidence that Mrs. Frazier and her husband owned the premises known as 6511 Union avenue, Chicago, in joint tenancy, and that the property was incumbered by a mortgage. Mrs. Frazier admitted on cross-examination that her husband was "hard pressed" for money; that her plan was to kill Lindstrom and thereby to obtain money and then to give it to her husband.

Loren Patrick, the other confessed participator in the commission of the crime, was also called by the prosecution. He corroborated Mrs. Frazier to the extent that her testimony implicated plaintiff in error and himself. Supplementing her testimony, he stated that after leaving her apartment on the night of December 6 with the body in the automobile and driving some distance he turned into an alley, took the body from the car, placed it against a fence in a sitting posture and then drove to Crown Point, reaching home about 4:00 o'clock in the morning.

Dennis J. Carroll, captain of police, testified that Lindstrom's body was discovered the morning after the murder, in an alley fourteen blocks from his home; that Mrs. Frazier was questioned at the police station; that she gave her name as Lillie Lindstrom and said that the decedent was her husband; that she had married him about four years before at Denver, Colorado; that Lindstrom was a cabinet maker; that he also constructed radio cabinets in their home, which he sold to private individuals; that their home life had been very peaceful and happy, and that on the night of December 6 Lindstrom left the apartment about 10:30 o'clock with a man to look at some radio cabinets.

Joseph C. Frazier testified that he married Lillian Frazier on September 3, 1906, and lived with her until October 19, 1922; that he first became acquainted with William Tunyea in July, 1922, when the latter became a lodger in his home; that he did not see Tunyea after October 19, 1922; that he saw plaintiff in error on December 11, 1926, at Sixty-third street and Union avenue, Chicago; that she

told him that his wife was at her house and that she was going to take her out in the country to find work; that he talked with plaintiff in error early the next week, when she handed him a note from his wife asking financial assistance and requesting him to destroy certain letters and photographs; that plaintiff in error urged him to comply with the request; that these letters pertained to his real estate, and that he destroyed the note and letters. The witness further testified that during the time of their separation his wife visited him once a week; that she told him she was working as a nurse, but that she did not tell him where or with whom she lived.

The substance of the testimony of plaintiff in error is as follows: She had been subject to epilepsy from childhood and was unable to do heavy housework. Her husband could not assist her, because he worked in Chicago. For that reason Patrick was employed, and he received only his board and the use of a room for such services as he performed. He was also employed by various neighbors. On December 6, 1926, plaintiff in error was at home in Crown Point. After preparing supper in the afternoon so that it might be served quickly, she drove to Hebron and did not leave that village until after five o'clock. While in Hebron she stopped at the post-office and the garage of Frank Felder. She owed Felder $10 for automobile tires and paid the bill by a check. The check signed by plaintiff in error, dated December 6, made payable to Felder and cashed by him, was introduced in evidence. Patrick had set the table before she returned and supper was ready when she reached home. Her son, Edward, ate hurriedly and left between 6:15 and 6:30 o'clock to attend a basket ball game at the high school. She had left the automobile standing in front of the house and requested Patrick to put it in the garage, but he told her that he was going to drive to Chicago, and he departed in a few minutes. Patrick often used the car for his own purposes. Plaintiff in error then cleared the

table, read a newspaper, did some mending and darning, covered her two birds and retired shortly after 9:00 P. M. Her son returned home about 9:30 o'clock, spoke to her and retired immediately. She heard the clock strike 3:00, and about half an hour later the automobile passed her bedroom window on the way to the garage and in about ten minutes Patrick entered the house. She inquired whether he had drained the radiator of the car, and he answered that he had done so. Later, at breakfast, Patrick said that he and Mrs. Frazier had killed the man with whom she had lived by beating him to death and that they had thrown his body into the street. Plaintiff in error thereupon became so excited that she could not remember the other details of the conversation, except that she told Patrick "it was an awful thing" and that he could no longer remain in her home. On the morning of December 10 she received a letter in an unfamiliar handwriting advising her to communicate with her husband. An epileptic fit prevented her from taking the train, but in the evening Patrick and her son drove her to Hammond, from whence, by bus and taxicab, she reached her husband's place of employment. She remained with him until the next morning and then returned by train to Crown Point, arriving there at 11:00 A. M. Patrick met her at the station and informed her of Mrs. Frazier's presence. When plaintiff in error entered the house Mrs. Frazier took her into a bed-room and told her about the killing of Lindstrom. Plaintiff in error promptly informed Mrs. Frazier that she could not stay at the former's home, whereupon the latter, on her knees, exclaimed: "My God, Kate, don't send me away! I haven't got a dime. Joe took the last cent and paid my fare down here and he is going to send me some money in a few days to get away." Plaintiff in error then said that she could keep her that night only. When she inquired why Lindstrom was killed, Mrs. Frazier answered that she was about to lose her home. The next morning plaintiff in error and Patrick took her

to a certain farmer who wanted a housekeeper. He did not like her appearance and refused to employ her. Later in the day they drove to the home of Ed Rice, in Hebron, and she worked for him a week. On the next day plaintiff in error took her two dresses and a pair of stockings, and she then asked for something to cover her hat. Two days later plaintiff in error brought her some black silk material for that purpose. About midnight, December 17, a Chicago police officer and the town marshal called. The former asked whether she was acquainted with Lillian Lindstrom, and she answered that she was not. The officer then inquired whether she was acquainted with Lillian Frazier, and she again answered that she was not, but she added that she knew Sue Frazier, a name by which Lillian Frazier was commonly known. She was asked where Sue Frazier could be found, and she said that she did not know. These answers were made in compliance with her promise to Mrs. Frazier that she would not disclose her whereabouts. The officers then made a thorough search of the house and saw Patrick there but left without making any arrest. The next day a letter with $20 came from Frazier for his wife. This letter and money plaintiff in error delivered to Mrs. Frazier. Pursuant to the request of Captain Carroll, of the North Avenue police station, plaintiff in error went to that station on Sunday, December 19. She was questioned throughout the night, and, although sick, the questioning was continued during the whole of the next day, and she was taken from one police station to another. She asserted her innocence of the crime charged. On the trial the plaintiff in error denied specifically that she had seen or met Mrs. Frazier from July, 1926, until the latter came to Crown Point after the crime had been committed; that she had knowledge of any insurance upon the life of Lindstrom; that she had ever participated in any discussion or conspiracy to murder Lindstrom; that she had ever given poison to Mrs. Frazier; that she had any connection with or knowledge of the pur-

pose of Patrick's trip to Chicago on December 6, or that she in any way participated in the murder of Lindstrom or the disposition of his body.

Edward Cassler, the son of plaintiff in error, testified that he was sixteen years of age; that on December 6, 1926, he attended the Crown Point high school; that when he returned from school in the afternoon of that day he found that his mother had gone to Hebron; that she returned shortly before six o'clock and supper was served about fifteen minutes later; that he went to the high school that evening to attend a basket ball game and that Patrick was in the house when he left; that upon his return home, about 9:30 P. M., his mother had retired; that he talked with her and retired at 9:45 P. M.; that he saw Patrick about 7:00 o'clock the next morning; that Patrick had lived in his parents' house two or three years and worked for his mother as well as the neighbors, and that he used the family automobile whenever he wanted it. The witness further testified that Mrs. Frazier came on December 9, when his mother had gone to see his father in Chicago; that in his mother's absence Mrs. Frazier and Patrick occupied the same bed, and that while engaged in conversation they would keep some distance from him.

The foregoing is the substance of the evidence admitted on the trial.

The contentions upon which plaintiff in error relies for a reversal of the judgment are: (1) That the trial court admitted incompetent and prejudicial evidence; (2) that the court gave erroneous instructions and refused to give proper instructions; and (3) that the verdict is against the weight of the evidence.

The testimony of Lillian Frazier that plaintiff in error gave her poison to be used in Lindstrom's food, it is insisted, was incompetent because there was no charge in the indictment concerning the use of poison. No objection was interposed to the question which elicited this testimony nor

was a motion made to strike it. Apart, however, from this condition of the record, the omission from the indictment of an allegation that poison was used would· not preclude the admission of evidence upon the subject. The allegations of ultimate facts are the material allegations of an indictment, and such facts, only,·need be alleged. *People* v. *Steinkraus, 291* Ill. *283.*

It is further argued that the trial court erroneously admitted testimony offered by the prosecution concerning acts and conversations subsequent to the time of the murder of Lindstrom and the disposition of his body. While the acts and declarations of one conspirator during the existence of a conspiracy are competent evidence against his co-conspirators, no act or declaration before the beginning or after the termination of the conspiracy may be given in evidence on the separate trial of a co-conspirator. (*People* v. *Halpin, 276* Ill. *363;* *People* v. *O'Brien, 277* id. *305.*) Joseph C. Frazier testified that his wife requested him to destroy certain letters and photographs, and that plaintiff in error joined in the request. More than a week had elapsed after the time Lindstrom was murdered when this request was made, and these letters related to the real estate which Frazier and his wife owned. Plaintiff in error had no interest in the property and the letters in no way connected her with the conspiracy to murder Lindstrom. Lillian Frazier testified at length concerning her movements subsequent to the commission of the crime. Much of this testimony had no relation to plaintiff in error nor did it concern the furtherance of any conspiracy. Any testimony which tended to show that she had a part in the murder or conspiracy to murder, including acts of concealment or the suppression of evidence, would be admissible against her. If, however, the circumstances are disconnected from and have no obvious relation to the crime charged they are irrelevant. Plaintiff in error and Mrs. Frazier had been acquainted for a considerable period. Their association and

the acts of Mrs. Frazier subsequent to the commission of the crime, although without any relation to the conspiracy, might unconsciously link the two women together in the minds of the jury, to the prejudice of plaintiff in error upon her separate trial. The defense was that plaintiff in error was not a participant in the conspiracy to commit the crime and was not present when the crime was committed. Testimony that she was guilty of assisting Mrs. Frazier after the murder, and therefore was an accessory after the fact, would not make her a principal in the crime charged nor justify the imposition of the death penalty. Proof that a person is an accessory after the fact is proof of an independent offense. In a prosecution for a particular offense, evidence of a distinct and substantive offense is irrelevant and inadmissible. (*People* v. *Meisner,* 311 Ill. 40; *People* v. *Lane,* 300 id. 422; *People* v. *King,* 276 id. 138; *Farris* v. *People,* 129 id. 521.) Even if it could be said that the evidence against plaintiff in error was so convincing that without regard to the incompetent evidence there could have been no other verdict than one of guilty, it does not follow that the evidence was not prejudicial to plaintiff in error. The legislature has clothed juries with a wide discretion in fixing the punishment to be inflicted upon a person convicted of murder. Every defendant on trial charged with that crime is entitled to the benefit of the statute. The jury fixed the punishment at the maximum authorized by law. No person can know what the jury would have done if they had fixed the penalty solely on the evidence concerning the crime charged. It is not for this court to say what the jury ought to have done. Plaintiff in error had the right not only to have her guilt or innocence determined free from incompetent evidence, but also to have her punishment, if found guilty of the crime charged, fixed solely with reference to the facts and circumstances of that crime. *People* v. *Meisner, supra; People* v. *Lane, supra; Farris* v. *People, supra.*

Complaint is made of the first and fourth instructions given at the request of the prosecution. The first instruction defined murder and mentioned poisoning as one of the means by which the unlawful killing might be perpetrated. It is contended that the reference to poisoning was prejudicial to plaintiff in error. The instruction merely set forth the statutory definition of the crime of murder. Nothing in the instruction could have led the jury to believe that the crime had been committed by poisoning, and it is not apparent how the instruction was prejudicial to plaintiff in error.

The fourth instruction consists of twenty-six lines and defines a reasonable doubt. It concludes with the sentence: "Your oath imposes upon you no obligation to doubt where no doubt would exist if no oath had been administered." An instruction of such length upon a subject which needs no definition serves only to confuse rather than to clarify and should not have been given. (*People* v. *Schuele,* 326 Ill. 366; *People* v. *Rogers,* 324 id. 224.) The giving of the instruction, however, does not constitute reversible error. *People* v. *Bell,* 328 Ill. 446; *People* v. *LeMorte,* 289 id. 11.

It is also contended that the trial court erred in refusing to give an instruction on the presumption of innocence, requested by plaintiff in error. Her third instruction given to the jury was, in part, as follows: "A defendant is presumed to be innocent of the charge throughout the entire trial until the State proves him guilty beyond a reasonable doubt, and during your consideration of your verdict you should consider this presumption of innocence." The instruction was sufficient and the tendered instruction was properly refused.

Complaint is also made of the court's refusal to give two other instructions defining a reasonable doubt. Both of these instructions were inaccurate, and in view of the given instructions upon the same subject neither was necessary.

The only evidence which implicated plaintiff in error was the testimony of Lillian Frazier and Loren Patrick, both of whom confessed that they actually committed the crime. The testimony of an accomplice is competent evidence, and, although uncorroborated, may be sufficient to sustain a conviction if it is of such a character as to prove guilt beyond a reasonable doubt. It is always, however, subject to grave suspicion and should be acted upon with great caution. (*People* v. *Maggio,* 324 Ill. 516; *People* v. *Harvey,* 321 id. 361; *People* v. *Johnson,* 317 id. 430.) What motive plaintiff in error had to participate in the murder of Lindstrom is not disclosed. She had met him only once—more than four years before his death. There was no agreement or understanding that she was to receive any part of the proceeds of the insurance upon his life. Lillian Frazier admitted on cross-examination that it was her purpose, after Lindstrom had been murdered, to give her husband the money she received from the insurance company in order that it might be applied in discharge or reduction of the mortgage on their property at 6511 Union avenue. She admitted that she had Patrick in mind "to do this job," and that she might have written him concerning it while he was at the penal farm. For four years, by her testimony, she lived in adultery with Lindstrom, occasionally meeting her husband on street corners, and not only kept him in ignorance of the life she was leading but falsely represented to him that she was employed as a nurse. Her representations to the police department immediately after Lindstrom's death were likewise false. Patrick, a man of the lowest type, was a willing tool in her hands. She dominated him by appealing to his vices. Neither of these accomplices is corroborated in a material particular. Joseph C. Frazier, the husband of Lillian Frazier, who professed to be ignorant of her manner of living or place of abode, was to be a joint beneficiary of the crime. Plaintiff in error, on the contrary, so far as appears, had neither motive

nor interest to participate in its commission. Obviously, her association with Patrick and Mrs. Frazier, particularly after she knew that they had murdered Lindstrom, deserves the most severe condemnation. Yet her testimony concerning her whereabouts during the afternoon and evening of December 6, 1926, corroborated by her son and confirmed in part by the check she gave to Felder, as against the uncorroborated testimony of the two self-confessed accomplices, raises a reasonable doubt of her guilt of the charge laid in the indictment.

The judgment of the criminal court of Cook county is reversed and the cause is remanded to that court.

*Reversed and remanded.*