THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MURRELL RICHIE *et al.* Plaintiffs in Error.

*Opinion filed June 18, 1925.*

1. CRIMINAL LAW—*when misjoinder of defendants is fatal.* It is proper to join two or more defendants in the same indictment where they commit the same offense as principals or act as principal and accessory, but an indictment charging two or more persons with the commission of a joint offense is not sustained by proof that each committed a distinct offense, and where the question is properly preserved the misjoinder is not a mere irregularity but is fatal, and the conviction must be reversed.

2. SAME—*when one is guilty as a principal.* To constitute one guilty of a crime as principal he must be present or participate or do some act at the time of the commission of the offense in furtherance of the common design, or if not present it must be shown that he by some affirmative act actually advised, encouraged, aided or abetted the perpetration of the crime.

3. SAME—*when defendants cannot be jointly indicted for rape.* Apart from the statute making accessories punishable as principals two persons cannot be jointly guilty of rape, as by the very nature of the act individual action is essential, and to justify conviction of defendants as principal and accessory there must be proof of a concert of action or an aiding or abetting of one by the other.

4. SAME—*subsequent knowledge of offense is not sufficient to show common design.* Knowledge of an offense or circumstances tending to show knowledge after its commission do not show concerted action or a common design to commit the offense.

5. SAME—*when evidence of another offense is not admissible.* Unless there is some connection between the facts proved and the offense charged it is improper to admit evidence of one crime to prove another.

6. SAME—*highest degree of certainty is required in indictment.* The highest degree of certainty is required in an indictment, as the offense must be stated with such certainty that a conviction or acquittal may be pleaded in bar of a subsequent prosecution for the same offense.

WRIT OF ERROR to the Circuit Court of Madison county; the Hon. J. F. GILLHAM, Judge, presiding.

R. W. GRIFFITHS, and WESLEY LUEDERS, (JESSE PEE-
BLES, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, JESSE R.
BROWN, State's Attorney, MERRILL F. WEHMHOFF, and
I. H. STREETER, for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the
court:

Murrell Richie and Emmett Courtway were jointly in-
dicted at the May, 1924, term of the circuit court of Madi-
son county for the rape of Elsie Tucker. By the jury's
verdict they were found guilty and the punishment of each
was fixed at fifteen years in the penitentiary. Motions for
a new trial and in arrest of judgment were made and over-
ruled and they were sentenced to the penitentiary. They
prosecute this writ of error to review the judgment.

At the time of the trial Elsie Tucker, the prosecutrix,
was twenty and both plaintiffs in error were twenty-one
years of age, and all were unmarried and resided in Gran-
ite City. The prosecutrix lived with her five sisters and
was employed in a real estate office. Richie worked for his
father, who was a general contractor. Courtway was em-
ployed in a rolling mill. On the afternoon of August 27,
1924, Clyde Cottrell, a young man with whom the prosecu-
trix had been acquainted two or three years, called at her
place of employment and invited her to attend a house party
to be given that evening in East Granite. She accepted the
invitation and he called at her home shortly after half-past
seven o'clock in an automobile driven by Roy Koesterer,
its owner. Two young women, Verna Webb and Pearl
Dodson, accompanied them. The prosecutrix entered the
car, and a little later a third young man, Henry Cuban,
also joined the party. They drove to Niedringhaus and
Madison avenues, where they met Richie in a Ford coupe.

He was a stranger to the prosecutrix. A conversation between the members of the company followed, in which it was stated that the house party would not be given but it was suggested that they go to a private house in the country. After unsuccessfully seeking another young woman to accompany them in order that the party might have an equal number, they left for the country, Richie and the prosecutrix riding in the Ford coupe and the others following in Koesterer's car. They drove several miles from Granite City to a club or roadhouse called "Pete's Place." After arriving there they sat on the front porch for a while, and later certain members of the party, if not all, went inside the house and danced and played musical instruments. Beyond this point the evidence is in conflict.

The testimony of Elsie Tucker, the prosecutrix, is, in substance: After the dancing had progressed for some time, one of the young women and Koesterer suggested that they return to Granite City. The five members of the party who had come in Koesterer's automobile returned in it. Richie and the prosecutrix followed in his coupe, but he soon stopped on the side of the road. She asked him to drive on, but he, despite her protests, took certain liberties. She endeavored to defend herself and succeeded in stepping upon the running-board of the car, but he grabbed her by the hair, drew a gun and said if she stepped from the running-board he would kill her. He dragged her back in the car, beat her and then ravished her. She tried again to leave the automobile, but Richie held her and drove her back to Pete's place. When they arrived there, Courtway, the other plaintiff in error, with whom she was not acquainted, came out of the roadhouse and told her that Richie said he would not take her home but that he, Courtway, would do so. She told him she would walk, but he assured her he would take her back and assisted her to the seat in the coupe and started driving toward Granite City. She soon discovered Richie's re-

volver behind the seat and threw it toward some water on the side of the road. When they approached a railroad crossing Courtway turned the car around, stating as his reason that Richie would object to his car being out so long and that he was going to take her back to the roadhouse. She tried to jump out of the automobile, but Courtway held her and drove into a side road, where he stopped. She asked him why, and he replied that he stopped for the same reason that Richie had done so. She resisted and succeeded in getting out of the automobile and started down the road, but Courtway pursued and overtook her, dragged her by the hair back to the car and threw her on the ground. She regained her feet, but he struck and pinched her and twisted her arms. While they were struggling a truck approached, and as it passed he held his hand over her mouth and his arm around her neck to prevent an outcry. After the truck had gone he threw her on the cushion which he had taken from the car and ravished her. She arose and started away, but he held her, put her back in the car and returned to Pete's place. When they reached the roadhouse Richie was in the yard. Courtway alighted from the car and Richie entered it and said he was going to take the prosecutrix home. She asked him to permit her to go, but he refused and started back with her. When they had gone a short distance Richie reached back of the seat for his revolver, and failing to find it immediately returned to the roadhouse. Upon their arrival Courtway and Joseph Shadler were standing in the yard, and one of them inquired the cause of their return. Richie replied that his gun was gone and that he wanted it. A prolonged discussion followed, in which both plaintiffs in error sought to compel the prosecutrix to inform them where the gun could be found, but she refused. Courtway, Shadler, Pete, the proprietor of the roadhouse, Richie and the prosecutrix started down the road to search for the revolver, the first three in one automobile and the other two in Richie's coupe. The search

proved fruitless. Richie then said that he would take the prosecutrix home and report the loss of the gun, because it was insured and he had used it while employed by the Federal government. When they approached Granite City he stopped his car and forced the prosecutrix to submit to another attack. She inquired whether he subjected every girl to such treatment, and his reply was that he did. He then took her to her home, which they reached about 12:30 o'clock A. M. She entered the house and told her sister what had happened. On the following morning she returned to work but was taken home at noon, after which she remained in bed for a week. The dress and undergarments which she testified she wore on the night in question were torn, and the latter showed blood stains, which she said resulted from the assaults. Late in the afternoon of the next day Dr. L. D. Darner was called.

Dr. Darner testified that he examined the prosecutrix and found several bruises on her wrists, arms, limbs and thighs. The prosecutrix appeared to him to be in a very nervous state. He ordered her to rest and prescribed a sedative for her.

On behalf of the plaintiffs in error, Cottrell, Koesterer, Cuban and Pearl Dodson testified that Richie remained at Pete's place from the time of his arrival continuously until they left, shortly before 11:30 o'clock. These same witnesses, and Shadler, Richie and George Pool, formerly a police officer and deputy sheriff, testified that they did not see Courtway at the roadhouse on the night in question. Pool further testified that on the same evening he went to Pete's place with a young woman named Marie Hart, who was looking for Shadler. They arrived about midnight and found Shadler there. Pool did not leave his automobile. He saw Richie, who was in his coupe with the prosecutrix and they were ready to leave. Richie asked Pool if he was going to town and whether Shadler could ride with him, and upon receiving an affirmative answer Shadler en-

tered Pool's car. Richie started and said to Pool, "Follow me." He followed Richie closely all the way to Granite City, did not lose sight of him at any time, and saw him stop in front of the prosecutrix's home, where she left the car and entered the house. Pool drove slowly while Richie stopped to permit her to alight from his car, but Richie overtook him about a block and a half away. When the prosecutrix reached her home she appeared the same as at the roadhouse. She had not been crying at that place, her hair was not disheveled nor was her clothing torn.

Shadler testified that he arrived at the roadhouse on the evening of August 27, at about seven o'clock, and remained there until midnight. After the party arrived Richie sat on the porch and talked with him most of the time. He saw Richie and the prosecutrix leave in the former's coupe about 12:00 o'clock, and he corroborates Pool's testimony with reference to the return trip to Granite City, including Richie's stop at her home.

Richie testified that he had never visited the roadhouse before. The prosecutrix directed the way, and after reaching the house he spoke to her only infrequently, because he did not dance. He remained on the porch and did not go inside. His coupe was parked in front of the steps from the time he arrived until he left, at ten minutes after midnight. At that time the prosecutrix came to him on the south end of the porch and asked, "Did they run off and leave me?" Richie inquired, "Ain't they here?" He then departed with her in his coupe. Pool's car followed all the way to Granite City and passed Richie as he stopped at the home of the prosecutrix to leave her there. He did not follow Koesterer's car on its return to Granite City, nor did he have a gun, nor did he ever assault the prosecutrix.

Courtway testified that on the night in question he visited Helen Hunt, a friend, who was ill at her home in St. Louis. He left Granite City about 6:40 o'clock P. M. and remained at her house until two o'clock the next morn-

ing. During his visit he gave her medicines and after his departure her mother attended her. He was a stranger to the prosecutrix and never committed the crime charged. He was arrested at his place of employment and was taken into the prosecutrix's presence for the purpose of identification. In answer to the officer's question whether he was guilty, she said, "Yes; I think that is the guy. I think that is the fellow. I can identify him by his pants." Taken directly from the rolling mill, he necessarily wore his working trousers when confronted by the prosecutrix. Because of the character of his work, especially on a hot August day, he testified his working clothes were entirely unfit to wear outside of the mill and that he never did so.

Helen Hunt testified that she was ill about six weeks in the summer of 1924; that during this period Courtway came to her home on several occasions, and that on the evening of August 27 he arrived at about seven o'clock and remained until one or two o'clock of the following morning. Her brothers, Edward H. Davis and William Davis, testified to the same effect.

The foregoing is the substance of the testimony offered on the trial. Plaintiffs in error deny that they committed any offense, but they contend that, even assuming the evidence of the prosecution as true, the indictment charged a joint offense while the State's evidence disclosed separate and distinct offenses, and that upon an indictment against two defendants both cannot be convicted jointly for distinct offenses, though of the kind charged in the indictment, when committed by them severally and growing out of separate transactions. The indictment reads: "The grand jurors * * * upon their oaths present that Murrell Richie and Emmett Courtway * * * male persons of the age of sixteen years and upwards * * * unlawfully, violently and feloniously did make an assault upon one Elsie Tucker, who was then and there a female person, and they, the said Murrell Richie and Emmett Courtway, her, the said Elsie

Tucker, did then and there unlawfully, violently and feloniously ravish and carnally know, forcibly and against her will." The charge is that the plaintiffs in error "did make an assault." It is joint and in the singular. The indictment contains no language indicating a purpose to charge separate offenses. It is proper to join two or more defendants in the same indictment where they commit the same offense as principals or where they act as principal and accessory. An accessory is defined (Smith's Stat. 1923, p. 720,) as "he who stands by, and aids, abets or assists, or who not being present, aiding, abetting or assisting, hath advised, encouraged, aided or abetted the perpetration of the crime. He who thus aids, abets, assists, advises or encourages, shall be considered as principal, and punished accordingly." To constitute one guilty of a crime as principal he must be present or participate or do some act at the time of the commission of the offense in furtherance of the common design, (*People* v. *Marx,* 291 Ill. 40,) or if not present, it must be shown that he by some affirmative act actually advised, encouraged, aided or abetted the perpetration of the crime. (*People* v. *Barnes,* 311 Ill. 559; *Watts* v. *People,* 204 id. 233; *Crosby* v. *People,* 189 id. 298; *White* v. *People,* 139 id. 143.) Apart from the statute making accessories punishable as principals, two persons cannot be jointly guilty of a crime such as rape, where by the very nature of the act individual action is essential. (*State* v. *Roulstone,* 35 Tenn. 107; *Durston* v. *State,* 82 Tex. Crim. 637; *Cox* v. *State,* 76 Ala. 66; *Walker* v. *Commonwealth,* 162 Ky. 111; Wharton's Crim. Pl. & Pr.—9th ed.— sec. 302; *State* v. *Herrera,* 207 Pac. 1085.) An indictment charging two or more persons with the commission of a joint offense will not be sustained by proof that each committed a distinct offense. (*Elliott* v. *State,* 26 Ala. 78; *Cox* v. *State, supra; State* v. *Deaton,* 92 N. C. 788; *State* v. *Hall,* 97 id. 474; *Moore* v. *State,* 12 Ohio St. 386; *State* v. *Roulstone, supra; Sampson* v. *State,* 83 Tex. Crim. 594;

*State* v. *Brown,* 58 Iowa, 298; 1 Bishop on Crim. Law,— 9th ed.—sec. 802; 1 Wharton's Crim. Proc.—10th ed.— secs. 352, 366; 1 Chitty on Crim. Law,—4th Am. ed.— *p. 268; 31 Corpus Juris, 755.) To justify the conviction of both plaintiffs in error on the indictment as drawn in the instant case there must be proof of a concert of action or an aiding or abetting of one by the other. Such proof is lacking in this record. With reference to the first attack alleged to have been made by Richie, there is no testimony that Courtway aided, abetted or participated in any way. The prosecutrix testified that Courtway came to the roadhouse with other persons after she and Richie had arrived there; that he was there on Richie's return with her after the first assault; that after Richie left his car Courtway came out of the roadhouse and said that Richie had stated he was not going to take her home, and that Courtway added that he would do so. It does not appear that Courtway had any prior knowledge of Richie's intention or of what had occurred between Richie and the prosecutrix until after they returned to the roadhouse. Courtway's statement to the prosecutrix that he stopped the automobile for the same reason that Richie had stopped it is evidence of his knowledge of what Richie had done but not that he had gained such knowledge prior to the perpetration of the crime. Knowledge or circumstances tending to show knowledge of an offense after its commission do not show concerted action or a common design to commit the offense. (*People* v. *Holtz,* 294 Ill. 143.) So far as the second alleged attack is concerned, Courtway took Richie's car and told the prosecutrix that he would take her home, but there is no evidence that Richie knew Courtway was to take the car or that Richie saw them leave. The testimony is merely that Richie would not take the prosecutrix home. There is no proof that Richie knew Courtway intended to commit the act charged or that he aided or abetted him in its perpetration. Again, with reference to the third attack, there is no evi-

dence whatever that Courtway had any knowledge of or in any way participated in it. The record fails to show that either plaintiff in error aided, abetted or assisted the other in the commission of the offense charged. (*People v. Meisner,* 311 Ill. 40.) Unless there is some connection between the facts proved and the offense charged it is improper to admit evidence of one crime to prove another. (*People v. Turner,* 260 Ill. 84; *People v. Meisner, supra.*) The three attacks to which the prosecutrix testified cannot be so blended together as to constitute a single offense. They were distinct acts and constitute distinct offenses. (*State v. Brown, supra.*) An acquittal of the plaintiffs in error of a charge based on one of the assaults could not be pleaded by both of them in bar of prosecutions for the other assaults. One reason why certainty in the statement of the offense is required is that the defendant's conviction or acquittal may inure to his subsequent protection if again prosecuted for the same offense. The highest degree of certainty is required in an indictment. *Wilkinson v. People,* 226 Ill. 135; *People v. Hallberg,* 259 id. 502.

But the State insists that the question of the misjoinder of the plaintiffs in error was not raised in the trial court and for that reason cannot be urged here. Plaintiffs in error reply that the question was raised on the motions for a new trial and in arrest of judgment. The misjoinder of the plaintiffs in error is not a mere irregularity. The prosecution's evidence tended to show distinct and separate offenses committed singly and not participated in by either plaintiff in error as an accessory. It therefore failed to show that they committed the crime charged in the indictment. An indictment which may apply to different offenses and does not specify which, is bad. (Wharton's Crim. Pl. & Pr.—9th ed.—secs. 151, 161.) For failure to prove the plaintiffs in error guilty as charged in the indictment the conviction must be set aside. *Townsend v. State,* 137 Ala. 91; *Jackson v. State,* 87 Ga. 432; *State v. Bridges,* 24 Mo.

353; *Sampson* v. *State, supra; Commonwealth* v. *McChord,* 32 Ky. 242; *Lewellen* v. *State,* 18 Tex. 538.

Plaintiffs in error urge additional grounds for the reversal of the judgment, but in view of what has been said it is unnecessary to consider them.

The judgment of the circuit court will be reversed.

*Judgment reversed.*