(No. 31246.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES TANTHOREY, Plaintiff in Error.

*Opinion filed November 22, 1949—Rehearing denied Jan. 12, 1950.*

JULIAN C. RYER, of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, PETER G. KUH, and RUDOLPH L. JANEGA, all of Chicago, of counsel,) for the People.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

A grand jury in Cook County indicted Charles Tanthorey and Raymond Fossett, jointly, for the murder of Joseph Grzeda by shooting. On the conclusion of the presentation of evidence on behalf of the People, Fossett asked the court to direct the jury to return a verdict finding him not guilty. This was done with the acquiescence of the People. Tanthorey was found guilty by the jury, his punishment fixed at life imprisonment, and this writ of error followed.

Tanthorey, a laborer, on the conclusion of his workday on the afternoon of Friday, November 26, 1948, with Fossett, started visiting taverns on West Cermak Road in Chicago. This continued until about 2 or 2:30 Saturday morning when the taverns closed. Being hungry, they entered a restaurant one door west of the northwest corner of Cermak Road and South Kedzie Avenue. Soon after,

Grzeda and his companion Holub entered the place. Tanthorey openly displayed a revolver; shortly thereafter he and Fossett left the place, proceeded west on Cermak Road one short block to Sawyer Avenue and turned south thereon. A few minutes afterwards Grzeda and Holub also left. They crossed Cermak Road to the southwest corner of its intersection with Kedzie and proceeded south on the west side of Kedzie about 125 feet to an alley which ran parallel to Cermak Road. They traversed this alley to where it emerged on Sawyer. There, by a tragic coincidence, they met Tanthorey and Fossett, and the former fired one shot, which hit Grzeda and from the effects of which the latter died within a few minutes. Tanthorey made no effort to leave, and while being transported to the police station he took a box of cartridges for the revolver from a pocket and placed them on the floor of the car.

Peggy Duett, a witness for the People, said she entered the restaurant and when she started to hang up her coat, Tanthorey began pulling it back and forth. Grzeda and Holub came in after she did. She turned around and saw Tanthorey pressing the revolver against Grzeda's ribs; she saw no scuffling, no blows struck, and heard no conversation between the men. Tanthorey then pulled Fossett out of the place, and they went west on Cermak towards Sawyer. She had a conversation with police officers a few moments after the two men left the restaurant, and as they were driving down Cermak towards Sawyer she heard the shot. While she was watching Tanthorey pull Fossett west on Cermak, she observed Grzeda and Holub leave and walk south on Kedzie.

Edward Gromala, a witness for the People, was in the restaurant with Frank Majkrzak and saw Tanthorey and Fossett. Grzeda and Holub came in later, and he saw the parties together, Fossett sitting against a wall, Tanthorey partly standing and partly sitting. When Grzeda walked

in, there was an empty seat next to Tanthorey which Grzeda occupied. Grzeda said "Sorry" to Tanthorey, and the latter said something in reply which witness did not catch. Grzeda then went to where Holub was. Fossett grabbed Grzeda's coat lapel, and the latter did the same to him. While this was taking place, Tanthorey walked up to the two, held the gun in Grzeda's ribs, and said, "I am not kidding either" or, "I am not fooling either." Tanthorey then grabbed Fossett, pulled him out of the door, and witness watched them go west on Cermak. Grzeda and Holub then left, and witness talked to some police officers and followed them in his car to the mouth of the alley on Sawyer. The police, Tanthorey, and Holub were there; Fossett was not. Grzeda was lying on the walk.

Majkrzak testified that, while in the restaurant, he heard Tanthorey tell Grzeda to get off his toe, and heard Grzeda say "I am sorry." Grzeda then moved to where Holub was seated. When Tanthorey and Fossett got up, the latter and Grzeda started a friendly conversation; and Grzeda gave Fossett a cigarette and offered one to Tanthorey, who had been trying to get Fossett away. Tanthorey refused it, put his hand in his pocket, pulled out the revolver and said, "Here is my cigarette." The witness related that some person kept pushing the gun away, telling Tanthorey at the time to put it away. He did not do so, but kept poking it in the ribs of Grzeda. Finally Tanthorey put the revolver in his pocket, said, "I am sorry," grabbed Fossett, and pushed him out of the place. Grzeda and Holub left a few minutes later. Witness heard the shot, went to the mouth of the alley, and grabbed Tanthorey, who was holding the revolver and standing over the prostrate form of Grzeda. Fossett was not there, and the witness did not see him until the police station was reached.

Frank Holub testified that when he entered the restaurant he sat on a window sill while Grzeda walked over to the counter and ordered two cups of coffee. While he

was drinking his coffee, there was a conversation between Grzeda, Fossett, and Tanthorey; what it was about the witness did not know, for there was a lot of conversation in the place. When their coffees were finished the two left, having been preceded by Tanthorey and Fossett. Holub said that he and Grzeda crossed Cermak Road and went south on Kedzie Avenue to the alley. They walked west through the alley towards Sawyer Avenue. Grzeda was about five feet ahead of him when Sawyer was reached, and they saw Tanthorey and Fossett at the alley mouth. Tanthorey, seeing Grzeda, said to him, "You are the smart guy," pulled out his revolver, and shot Grzeda. Grzeda staggered, walked north fifteen or twenty feet, and fell down. Fossett said to Tanthorey, "Give it to the other guy," or "Give it to him." Following the shooting, Fossett disappeared, and Holub did not see him again. On cross-examination Holub said there was no struggle between Tanthorey and Grzeda just prior to the shooting, for the latter had both arms to his body all the time and made no effort to grab hold of Tanthorey.

Jack Morrissey, a police officer, told of arresting Fossett on Cermak Road one block west of Sawyer Avenue right after the shooting. Fossett, he said, was "somewhat, not completely drunk." George Mrazek, another officer, testified to placing Tanthorey in his car after the shooting, and of looking in it after Tanthorey had been removed therefrom and finding a box of cartridges. This officer searched Tanthorey at the time of his arrest at the scene of the shooting and did not find on him any razor, razor blades, or shaving soap.

Tanthorey, testifying in his own behalf, and as his own witness, in substance said: "I went to a tavern right after work, met Fossett and wife there, and while with them drank twenty to twenty-five beers. I then went home for about twenty minutes to make preparations to leave for Cincinnati with my wife, Fossett being with me.

At this time I was slightly half drunk and half sober. After changing clothes, I shaved and put the razor and shaving brush in my pocket. While packing the suitcase I put the revolver in a pocket of the clothes changed into. I was not aware I was carrying the revolver, (which was loaded with six cartridges) until I inadvertently pulled it out while reaching in my topcoat pocket for a cigarette. Fossett and I left before packing was completed to see about bus tickets. While on this mission, Fossett wanted to go to West Cermak Road and Kedzie Avenue to see someone. Upon arriving in that vicinity we proceeded to visit taverns, shaking dice for the beers and whiskies. I remember the first three drinks I took in the last tavern visited; when this place closed, we went into the restaurant. No one in there could have stepped on my toes. That was impossible due to the way I was sitting. Further, no one bumped or brushed against me, and I do not remember saying anything in the restaurant, as I realized that I had the gun on me and wanted to get out of there. I do not remember putting the revolver in anybody's ribs, and I could not have done so, despite what the witnesses said. I am positive I did not point the gun at anyone. I did not realize I had the revolver with me until I started to get my full faculties back; when such realization came, I wanted to get out of the restaurant and dispose of the weapon in a place where it would not be found for a while. Without knowing which direction I was going on Cermak Road, I led Fossett westward from the restaurant towards Sawyer Avenue. When I reached the mouth of the alley on Sawyer, I had the revolver in my hand prepared to throw it in the alley. Just as I was stepping down into the alley close to the building line, a man jumped out of the alley and grabbed me by the left arm, opened my coat and said, 'Here they are now.' That was all I heard; and as I threw up my arm to ward off a blow, someway the gun went off. Grzeda got hold of my arm and spun me around to the left.

I did not shoot him intentionally. I didn't realize he was shot. I didn't know it. When Grzeda said he was shot, I said he wasn't. After he fell, I just stood there until I was arrested. I denied to the police the ownership of the revolver and box of cartridges, but when someone told the officers the gun belonged to me, I admitted ownership. I was pretty well sobered up thirteen or fourteen hours after the shooting when I admitted ownership of the revolver. Until then I was unable to make a statement, as I was too intoxicated to talk to anybody. I couldn't grasp what happened."

The People introduced rebuttal testimony. Holub denied that Grzeda ever said, "Here they are now." Paul Johnson, a police officer, said Tanthorey was questioned by him about eight o'clock of the morning of the shooting and he answered all questions coherently; although Tanthorey had been drinking, he·was not drunk.

The indictment charged the killing to have been jointly committed by Tanthorey and Fossett as principals; the proof established it was done by Tanthorey alone. This, according to the defendant, constitutes a fatal variance. The People contend the question of variance was not raised in the trial court and cannot be raised now. The question was presented to the trial court in the motion for a new trial. That was sufficient to save it for review here. (*People* v. *Richie,* 317 Ill. 551; *People* v. *Oswald,* 340 Ill. 434.) The variance does not exist, for a joint indictment against two or more may be found, provided the same evidence concerning the act which constitutes the crime applies to all persons indicted. (27 Am. Jur., Indictments and Informations, sec. 123.) Indictments, though joint in form, are regarded as a several charge against each defendant, save in those cases where the agency of two or more is of the essence of the offense, and all or a part may be convicted or acquitted. Where a joint offense is not established, the prosecution may be compelled to elect as to

which defendant it will proceed against. The election may be by *nolle prosequi* or voluntary dismissal as to all but one defendant. The indictment will stand as if it had been a separate one. (31 C.J., Indictments and Informations, sec. 319D, p. 757.) Two or more defendants may be charged in the same indictment where they commit the same offense as principals or where they act as principal and accessory. (*People* v. *Richie,* 317 Ill. 551.) They may be joined in the same count. (*People* v. *Sink,* 374 Ill. 480; Ill. Rev. Stat. 1947, chap. 38, par. 582.) The People took a voluntary dismissal against Fossett when they conceded his motion for a directed verdict of not guilty was a proper one.

The defendant quotes various statements made by the assistant State's Attorney in arguing to the jury on the theory they were prejudicial enough to warrant a reversal. Only one of those statements may be considered here, it being the only one in the abstract of the record. (*People* v. *Reno,* 324 Ill. 484.) The official requested the jury members to perform their duty rightly and courageously, uphold the law so the public can look forward to proper law enforcement, "so do not come in with a verdict for which you would be publicly criticized." We cannot see how the statement could be inflammatory to the degree alleged by defendant and thus prejudice him with the jury.

The court is charged to have erred in giving certain instructions and refusing to give others. The defendant was represented by two attorneys of his own selection. One of them withdrew from the case just before the trial court started to read the instructions to the jury; and the counsel now solely representing the defendant in this court was allowed to file his appearance as an attorney for him. No objection was made to the giving or refusal of certain instructions until present counsel made and argued the motion for a new trial. Refusal of the court to grant the motion, in respect to giving or refusing instructions, was

preserved for review by assignment of error. *People* v. *Cash,* 326 Ill. 104.

People's given instruction No. 2 dealt with the definition of "malice," saying that in law it is used to denote an action flowing from any wicked or corrupt motive when the act involved is attended with such circumstances indicating a heart fatally bent on mischief; further, that malice is implied from a deliberate or cruel act, however sudden, showing an abandoned and malignant heart, and therefore, if the jury found from the evidence beyond a reasonable doubt the defendant committed a deliberate and cruel assault upon Grzeda which showed an abandoned and malignant heart, then the jury would be warranted in finding defendant committed such assault with malice within the meaning of the law. Defendant argues that the last sentence caused the jury to believe him guilty because of what took place in the restaurant, something it should not have done because what took place there and defendant's intoxicated condition could not in anywise be associated with the subsequent killing as indices of malice. With that view we cannot agree, for there was a close association in respect to elapsed time and distance between the restaurant location and the place of the shooting.

People's instruction No. 4 in substance informed the jury that if it find from the evidence beyond a reasonable doubt that defendant knew it was wrong to do the killing, and was capable of choosing to do the acts constituting the crime and of governing his conduct in regard to such choice, the jury should find him guilty if it believed from all of the evidence beyond a reasonable doubt that he was guilty, even though the jury believed him to be intoxicated at the time of the killing. Defendant said this instruction placed upon the jury the task of determining his guilt or innocence on the basis of his being capable of choosing between right or wrong regardless of his intoxication, and not on

the basis of "whether he did it or not." The wording of the instruction does not convey the meaning advanced by defendant.

People's instruction No. 5 instructed the jury on the presumption of innocence attaching to the defendant and staying with him until the jury believes from the evidence that he is guilty beyond a reasonable doubt. Defendant charges the instruction to be wrong because it did not contain a statement that he could be convicted of a lesser offense. That statement was not necessary, for the instruction as given would govern the jury in its deliberations whether he was found guilty of murder or a lesser offense.

People's instruction No. 7 was on the subject of the credibility of witnesses. It told the jury its verdict "will not necessarily be determined by the number of witnesses testifying for either side." Defendant said the word "necessarily" left with the jury the idea that the number of witnesses is of great importance and weight but not conclusively controlling. The word, when studied as a part of the whole instruction, would not have the effect on the jury attributed to it by defendant. The instruction set forth the usual qualifying tests of credibility ending with the phrases, "and the extent to which any witness is contradicted or corroborated by any other credible evidence, if at all, and any evidence that tends to shed light on his or her credibility." The last, according to defendant, opens the door for the jury to use anything to test a witness's credibility. It confines the jury to evidence adduced during the trial, and is similar to a questioned instruction in *People v. Costello*, 320 Ill. 79, (at page 107,) the giving of which was approved by this court.

People's instruction No. 11, setting forth the forms of verdict, is attacked by defendant because it required the jury to either find him guilty of murder or acquit him, and was tantamount to an instruction to find him guilty.

This will be considered along with those allegations of error arising out of the refusal of the trial court to give certain instructions tendered by defendant.

Certain of the defendant's instructions were not given because they pertained to the defense of self-defense. Others were not given which related to the proposition that defendant was so intoxicated at the time of the killing that he was incapable of forming a felonious intent because he was unable to differentiate between right and wrong or realize the consequences of his act; also that the killing was simply a misadventure excusable under the circumstances. The instructions on self-defense were properly refused; the defendant testified the killing was an accident, that he was not aware he had fired the revolver or that he had shot Grzeda, and it was not his intention or purpose to shoot him. The instruction on nonliability for killing through misadventure was refused, and the defendant does not complain of that in this court; the refusal to give that instruction does have some bearing upon the questioned right of the court, under the evidence adduced, to refuse to instruct the jury that it could find the defendant guilty of manslaughter instead of murder. Defendant argues the evidence does not establish he deliberately intended to take the life of Grzeda, because the circumstances of the killing, as divulged by a comparison of his testimony with that of Holub, shows an utter absence of malice, express or implied. This is, in effect, a claim of no relation whatever between what transpired in the restaurant and the killing. This court in *Davison* v. *People,* 90 Ill. 221, stated that: "The word malice is defined to be 'A formed design of doing mischief to another, * * *. It is either express, as, where one with a sedate and deliberate mind and formed design kills another, which formed design is evidenced by certain circumstances discovering such intention, as in laying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm, or implied,

as, where one willfully poisons another; in such a deliberate act the law presumes malice though no particular enmity can be proved.'" This definition was restated in *People* v. *Scalisi,* 324 Ill. 131. Certainly, the antecedent menacing acts of defendant to Grzeda, said by witnesses to have occurred in the restaurant, cannot be divorced from the act of killing on the theory of no relationship. Furthermore, the defense of misadventure advanced by him in his testimony cannot be reconciled with the offense of manslaughter any more than it can be reconciled with the offense of murder. The two are incompatible and cannot emerge from one factual situation. His testimony contains no facts, assuming it to be true, upon which the giving of a manslaughter instruction could be rightfully predicated. According to the testimony, Cermak Road, between Kedzie and Sawyer Avenues, constituted a short block of approximately 220 feet. The alley was about 125 feet south of Cermak Road. The width of the latter is not shown in the record. The defendant, from the time he left the restaurant to the time of the killing, traveled about 325 feet plus the width of Cermak Road. Granting that he hurried, there was ample time for him to have ·been swayed by reason so that his anger against Grzeda for any real, assumed or believed provocation would not motivate his future acts in respect to the latter. The oft-stated rule holds that if a sufficient time has intervened between the provocation and the killing to permit the voice of reason to be heard, the crime cannot be manslaughter, but if any crime be committed it must be murder. (*People* v. *Bartley,* 263 Ill. 69; *People* v. *Newman,* 360 Ill. 226.) A manslaughter instruction also would not have been warranted on the theory the defendant was so intoxicated he could not generate the malice essential to make the crime murder. The evidence, in respect to his being intoxicated, must show it was so great as to entirely suspend his power of reasoning before a manslaughter instruction would be war-

532

ranted. (*People* v. *Minzer*, 358 Ill. 345.) The testimony regarding his condition, coupled with other facts and circumstances in evidence, does not bring him within the rule. The killing of Grzeda by defendant, if found to be a crime by a jury, could only be the one of murder. If it was not murder the defendant was not guilty. There was no error in the giving of People's instruction No. 11.

Clearly, the verdict of the jury is not the result of any passion or prejudice; for there is evidence in the record, as set forth herein, that warranted it in believing beyond a reasonable doubt that defendant was guilty of the crime of murder. The record being free of error prejudicial to the defendant, the judgment of the criminal court of Cook County will be affirmed.