THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIE B. WALLS, Defendant-Appellant.

Second District   No. 2—90—0549

Opinion filed January 30, 1992.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, and Kielian & Walther, of Chicago (M. Jacqueline Walther, of counsel), for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Willie B. Walls, was charged by indictment in the circuit court of Kane County with one count of attempt (murder), one count of armed violence (based on aggravated battery causing great bodily harm) and four counts of aggravated criminal sexual assault (while using a dangerous weapon; caused great bodily harm by stabbing; so as to endanger life by stabbing; during the commission of armed violence). Ill. Rev. Stat. 1989, ch. 38, pars. 8—4, 33A—2, 12—14(a)(1), (a)(2), (a)(3), (a)(4).

The defendant was acquitted of attempted murder, but he was convicted of the remaining charges. His motion for a new trial was denied except insofar as it sought the dismissal of multiple counts of aggravated criminal sexual assault. He was sentenced on one count of aggravated criminal sexual assault and for armed violence to concurrent terms of eight years.

He appeals, contending (1) that the jury instructions erroneously omitted the requirement that the State prove beyond a reasonable doubt an absence of justification for his conduct; (2) that the absence of an aggravated battery issues instruction (the felony underlying the armed violence charge) requires reversal of his conviction; (3) that the evidence concerning the presence of semen was improperly admitted where the semen was not from him, he was precluded from questioning the complainant as to other sexual contact, and the prosecutor knew that the complainant had engaged in intercourse with someone else shortly before this incident; (4) that evidence and argument concerning his alleged conversation with police and failure to turn himself in to police thereafter were improperly presented; and (5) that his conviction of armed violence must be vacated in that it is based on the same conduct as his aggravated criminal sexual assault conviction.

In August 1989, the defendant and the complainant had known each other for some time. They were former neighbors whose relationship had evolved into an active sexual relationship, and they lived together for a year and a half. Even after they stopped living together in May 1989, they continued to see each other, and the defendant continued to assist the complainant financially.

On the evening of August 30, 1989, the defendant went to the complainant's house in Aurora after speaking with her on the tele-

phone and agreeing to bring her some money to help her with her telephone bill. When the defendant arrived, the complainant let him in. The complainant's 10-year-old daughter was also home but was asleep in a bedroom.

The defendant and the complainant watched television, split a sandwich, had a beer and talked. They also engaged in intercourse in the living room of the complainant's apartment; their testimony differed as to when the intercourse occurred and whether it was consensual.

The complainant testified that the defendant asked if they could have sex and that she said no. She stated that, after that, they continued watching television and that the defendant was not upset. They then spoke further, and the defendant asked about another relationship of the complainant's. Although the complainant claimed that she was not upset, she told the defendant to leave. Complainant stated that the defendant then pulled out a small steak knife with a blade not longer than three inches. She knocked the knife away from him, and they began to wrestle. They ended up on the couch with the defendant on top of her, choking her neck with his hands. Although neither struck the other, and nothing was said, the complainant stated that she was trying to fight the defendant off.

According to the complainant's testimony, the defendant held her by her braided hair during the struggle, told her to turn the light on, and she did so. The defendant began looking for the knife, and she and he both saw it wedged along the side of the couch. The defendant turned the light off and began to lead her toward the couch. The complainant grabbed for the knife by the blade end. The complainant stated the defendant tried to, and did, take the knife away from her and that her hands were cut.

The complainant stated that the defendant then held the knife and instructed her to close the patio door, lock her front door, and undress. The complainant stated the defendant walked her over to both doors, pulling on her hair, and that she did as she was told. When she disrobed, the defendant was four feet away. The complainant stated that she screamed, kicked, and wrestled with the defendant on the floor. She kicked a table into the wall to try to let her neighbor know there was something going on in her apartment. The complainant's daughter was not awakened by these noises.

After the complainant kicked the table, the defendant stabbed her. He was sitting on her legs and she was holding his hand, trying to keep the knife away, but she could not. The first stab was in the middle of her chest and it hit bone. The second stab to her chest was

slow and a little off-center. She heard air coming out of her chest after that stab. The complainant testified the defendant then told her to put her legs up, and he put his penis in her vagina; he still had the knife. She did not know if he ejaculated.

The complainant got up from the floor and went to the kitchen to wash her wounds; there were clots of blood coming from the second stab wound. The defendant sat on the couch and put the knife in his back pocket. He told her the cuts did not look that bad and that she had made him do something he did not want to do. He also remarked that he guessed he would be going to jail now, and she said, no, he was not. She testified she said that because she feared he would finish killing her if she said he was going to go to jail.

After the defendant left, the complainant telephoned her sister-in-law, who lived in the building next door. Complainant told her sister-in-law that she had been "cut." Complainant's sister-in-law came over and then called her husband, the complainant's brother, and the police. Complainant's brother arrived along with the police, and an ambulance took the complainant to the hospital. The complainant testified she did not really get to speak to her brother until she got to the hospital, but the complainant's brother testified that the complainant told him when he arrived at her house and called 911 that she had been raped.

The defendant's testimony was that, after he had been at the apartment for about half an hour, he asked the complainant if they could have sex. She agreed. The complainant removed her jeans and got on the floor. The defendant began to have intercourse with her consent, but he stopped because he was having difficulty on the floor due to a leg-and-knee injury. The defendant testified that he did not force the complainant to engage in sex and was not holding a knife to her. He testified he did not ejaculate.

Afterward, defendant testified they ate, had a beer, watched television, listened to the radio and talked. Later, the conversation got heated. The defendant testified that the complainant came out of the kitchen with a knife and they were arguing. He grabbed her wrist, she "was slinging [him] around," and they went over the table and *** the couch." The defendant then saw blood on the complainant's chest, and they stopped. The defendant stated that he helped the complainant clean herself off and he wanted to take her to the hospital. She refused and said that she would call her brother. The complainant told the defendant to leave, apparently because she did not want her brother to get into an argument with the defendant.

The doctor who examined the complainant at the hospital, Manuel Sarricoa, M.D., stated that the complainant had two stab wounds in her chest, cuts on her hands, and a bruise on her left shoulder. Although the complainant told police and hospital personnel that there had not been an ejaculation, a "rape kit" was taken at the hospital which included specimens from a vaginal swab.

The two cuts to the complainant's hands were less than one inch long and were sutured. One of the cuts in her chest, also less than one inch long, caused a puncture of the lung which caused air to leak outside the lung into the chest cavity. The doctor testified that although any stab wound to the chest is potentially serious and life-threatening, the complainant's life was not in danger at the hospital; she was observed in the hospital for two or three days and released.

A forensic scientist, Jennie Hahn, testified that semen was present on the vaginal swab taken from the complainant. The swab revealed factors which would be present in a person who is a secretor with type O blood. A secretor is a person whose genetic markers can be detected in body fluids. The defendant had type O blood and was a secretor; Hahn testified that the defendant could not be eliminated as a possible source of the semen. Seventy-four percent of the black population of the United States are also secretors. The complainant herself was a secretor and also had type O blood. Her blood type factors could not be separated from the semen.

An Aurora police dispatcher, Linda Adams, was allowed to testify over defense objection to a conversation she had with the defendant in the early morning hours of August 31, 1989. According to the dispatcher, the defendant called in response to a prior police call to him. Adams stated the defendant admitted during the conversation having been in Aurora at his girlfriend's apartment. Adams stated the defendant did not respond when she asked if he realized he had hurt the complainant badly. According to Adams, the defendant agreed to turn himself in, but he did not do so. At the time she spoke with the defendant, no complaint had been filed against him. Charges were filed on September 6, 1989.

The defendant first argues that, where he was charged with armed violence based on the underlying offense of aggravated battery and where he presented evidence he acted in self-defense, the lack of a self-defense instruction and an instruction to the jury that the State must disprove the existence of justification for his conduct was plain, reversible error. The State disagrees, arguing that the lack of legal justification is not a necessary element of the offense of battery. Rather, the justifiable use of force is considered to be an affirmative

defense which defense was not available to the defendant here, where he testified that the complainant was stabbed accidentally during the course of their struggle. Further, the failure to instruct the jury on the lack of legal justification, even if error, is not such grave error as to warrant application of the plain error doctrine.

■■ We find the defendant has waived this issue by failing to raise any objection to the State's instructions at trial, to tender his own, or to raise the matter in his post-trial motion. Although substantial defects in jury instructions may be considered despite a defendant's failure to properly preserve the issue (*People v. Reddick* (1988), 123 Ill. 2d 184, 198, 134 Ill. 2d R. 451(c)), that exception will be invoked only to correct grave errors or to correct errors in cases so closely balanced that fundamental fairness requires that the jury be properly instructed (*Reddick*, 123 Ill. 2d at 198; *People v. Thurman* (1984), 104 Ill. 2d 326, 329-30). The evidence in the instant cause was not closely balanced, and the defendant has not challenged its sufficiency.

Moreover, absence of legal justification is not an element of the offense of battery where the defendant has not raised the affirmative defense of justifiable use of force. (*People v. Sambo* (1990), 197 Ill. App. 3d 574, 582; *People v. Worsham* (1975), 26 Ill. App. 3d 767, 771.) Although the defendant posits that the evidence "suggested" that he acted in self-defense, his testimony was that he was the one who first pushed and then grabbed the complainant, that he did not think that she intended to use the knife against him, and that when they fell over the end of the table and the couch "that was the end of it." This evidence does not suggest that the complainant was cut and stabbed by the defendant in self-defense but, rather, that she was wounded accidentally during the course of their struggle.

The defense of justifiable use of force and accidental use of force cannot be simultaneously relied upon in defense of a violent crime. (*People v. Shelton* (1985), 140 Ill. App. 3d 886, 890.) "[S]elf-defense, whether reasonable or not, relates to the intentional or knowing use of force and not to an accidental [use of force]." *People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 893; see also *People v. Tanthorey* (1949), 404 Ill. 520.

Accordingly, we conclude this issue has been waived and the plain error doctrine is inapplicable.

The defendant next contends that plain, reversible error occurred because the jury was not instructed on the elements required to prove the offense of aggravated battery, the offense underlying the armed violence charge. The State construes the defendant's argument to be that reversal is required because the jury was not given the aggra-

vated battery issues instruction in addition to the definitional instruction for that offense notwithstanding the fact that he raised no objection at trial or in his post-trial motion to the lack of such issues instruction nor did he tender same himself.

■ We find, as above, that the defendant has waived this issue and that the plain error doctrine is inapplicable. The definitional instruction given for the offense of aggravated battery, Illinois Pattern Jury Instructions, Criminal, No. 11.07 (2d ed. 1981) (hereafter IPI Criminal 2d), sets out the "elements" of that offense, to wit: intentional causation of great bodily harm during the commission of a battery. In addition to the definitional instruction for armed violence and aggravated battery, the jury also received the definitional instruction of battery and the issues instruction for armed violence. (IPI Criminal 2d Nos. 11.05, 11.20.) Further, the committee note to the definitional instruction for armed violence directs that the court "[g]ive the instruction *defining the offense* that is the subject of the armed violence." (Emphasis added.) IPI Criminal 2d No. 11.19, Committee Note.

Indisputably, the State must prove every element of an asserted crime beyond a reasonable doubt (*People v. Reddick* (1988), 123 Ill. 2d 184, 195) in order to sustain a conviction, and the court is obliged to insure that the jury is instructed on certain fundamental issues such as the elements of the crime charged, the presumption of innocence, and the burden of proof (*People v. Pegram* (1987), 152 Ill. App. 3d 656, 660, *aff'd* (1988), 124 Ill. 2d 166). A failure to provide essential jury instructions deprives the accused of a fair trial (*Pegram*, 152 Ill. App. 3d at 660), and, thus, it is important that jury instructions contain all the issues involved in an offense (*People v. Thurman* (1983), 120 Ill. App. 3d 975, 981, *aff'd in part, rev'd in part* (1984), 104 Ill. 2d 326).

The defendant was charged here with armed violence, however, not aggravated battery, and the jury properly received the "issues" instruction for armed violence (IPI Criminal 2d No. 11.20). One of the "issues" to be proved beyond a reasonable doubt according to that instruction was "[t]hat the defendant committed the offense of [aggravated battery]" which, the jury was instructed, is committed "when [the defendant], in committing a battery, [intentionally] causes [great bodily harm] to the person harmed." (IPI Criminal 2d Nos. 11.20, 11.07.) As the State points out, if the jury was given the issues instruction for aggravated battery, it may have been confused rather than enlightened by it since it refers to sustaining "the charge" of aggravated battery and that the defendant should be found either

"guilty" or "not guilty" based on its consideration of whether each or any of the propositions has been proved beyond a reasonable doubt. There was no "charge" of aggravated battery here, nor were there verdict forms on which to record the jury's judgment of guilty or not guilty. There was no misstatement of the State's burden of proof as in *Reddick* (123 Ill. 2d at 194-99), nor was an element of the offense omitted from the issues instruction as in *People v. Ogunsola* (1981), 87 Ill. 2d 216, 218-23.

Accordingly, notwithstanding the defendant's waiver of the issue, we find no error in the instructions given to the jury.

The defendant's next contention is that the evidence concerning the presence of semen found in the complainant's vagina was improperly admitted. He argues such evidence was improper where (1) test results on the semen showed only that he, a type 0 secretor, was one of many potential semen donors who could not be eliminated as a possible source of the semen; (2) he was precluded from questioning the complainant as to other recent sexual contact; and (3) the State admitted that it knew the complainant had engaged in intercourse with someone other than the defendant within the 72-hour time period prior to the offense.

As to the test results, the defendant failed to raise this issue during trial although he did raise it in his post-trial motion. Contrary to the defendant's argument, however, simply raising such an issue at the post-trial stage does not serve the essential purpose of the waiver rule. That essential purpose is to obtain timely resolution of evidentiary questions at trial (*People v. Carlson* (1980), 79 Ill. 2d 564, 576) in order to prevent a party who fails to object from gaining the advantage of obtaining a reversal based on his own failure to act (*People v. Roberts* (1979), 75 Ill. 2d 1, 11). "*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphasis in original.) *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

Despite the defendant's waiver, we will address the issue in the interest of forestalling the introduction of this type of evidence under similar facts in the future.

Relevant evidence is evidence which has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. (*People v. Eyler* (1989), 133 Ill. 2d 173, 217.) To be relevant, and, thus, admissible, evidence need only tend to prove or disprove a disputed fact. *People v. Uzelac* (1988), 179 Ill. App. 3d 395, 407.

In *People v. Schulz* (1987), 154 Ill. App. 3d 358, upon which the defendant relies, the court reversed the defendant's conviction of murder where, in the absence of other significant corroborative evidence, the State introduced testimony concerning blood and semen samples that proved only that the defendant could not be excluded as a suspect. The test results there simply placed the defendant in an extremely large category of possible donors, that is, at best, the semen came from someone within a 20% group of the general population. Evidence similar to that in *Schulz* has been found admissible, however, where it tended to support other evidence. *People v. Murff* (1991), 214 Ill. App. 3d 1034 (complainant identified the defendant whom she had known for several years); *People v. Wright* (1989), 186 Ill. App. 3d 159 (complainant identified the defendant in photo and in-person lineups); *People v. Uzelac* (1988), 179 Ill. App. 3d 395 (complainant identified the defendant in lineup and there was *modus operandi* evidence).

Although the victim here also positively identified the defendant, the instant cause is distinguishable from *Murff, Wright* and *Uzelac* in that each of those defendants asserted an alibi defense, thus placing the perpetrator's identity in question. Here, the defendant admitted he had intercourse with the complainant, and the only disputed fact was whether the intercourse was consensual. Clearly, evidence of the emission of semen is not required to prove sexual penetration (*People v. Allman* (1989), 180 Ill. App. 3d 396, 402; Ill. Rev. Stat. 1989, ch. 38, par. 12—12(f)), and neither the presence nor absence of semen is probative of whether an act of sexual penetration was consensual. Consequently, the semen evidence was not probative of any fact in issue.

Despite this conclusion, we nevertheless find admission of the semen evidence was harmless beyond a reasonable doubt. Errors will be held harmless when they could not reasonably have affected the result or contributed to the defendant's conviction. (*People v. Keefe* (1991), 209 Ill. App. 3d 744.) The only possible effect of this improper evidence would be to cast doubt on the credibility of the defendant's testimony that he did not ejaculate. The complainant herself testified at trial, however, that she did not know whether the defendant ejaculated, and there was evidence she had stated at an earlier time that he did *not* ejaculate. Consequently, the defendant's credibility on a point which was not probative in the first place could not seriously have been damaged by this evidence. This is particularly so where forensic scientist Hahn testified, and, thus, the jury was apprised, that (1) the complainant's own genetic factors could not be segregated out

from the semen because she was also a type O secretor; (2) she would be able to tell if semen from a different blood group had been deposited in the complainant's vagina; and (3) her testing would have been reflective of semen deposited at any time within a three-day period prior to the submission of the samples. We note further that defense counsel's closing argument concerning this last point included a "suggestion" that one of two other persons whose names were mentioned at trial was the semen depositor. Finally, the jury was instructed that the emission of semen is not required to prove sexual penetration. (IPI Criminal 2d No. 11.65 (Supp. 1987).) Thus, any prejudicial effect of this improper evidence was thoroughly diluted, and, absent it, we find the jury's verdict could not reasonably have been different.

We reject the defendant's related argument that the improper admission of the semen evidence was compounded by the court's application of the rape shield statute. (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.) The defendant argues the court's application of the statute precluded him from cross-examining the complainant concerning her sexual activity with another person within the relevant 72-hour time period and, thus, precluded him also from effectively presenting his theory of defense and prejudiced his right of confrontation.

The rape shield statute, promulgated to avoid harassment of the complaining witness (*People v. Ellison* (1984), 123 Ill. App. 3d 615, 626), precludes the introduction of evidence of a rape victim's prior sexual activity or reputation, except past conduct with the defendant (Ill. Rev. Stat. 1989, ch. 38, par. 115—7). The clear and explicit language of the rape shield statute is not unyielding, however, where the right of confrontation sought to be exercised by way of cross-examination is both relevant and based on a showing of bias, prejudice or motive. *People v. Sandoval* (1990), 135 Ill. 2d 159, 174-75, referring to *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.

For instance, in *Olden v. Kentucky* (1988), 488 U.S. 227, 102 L. Ed. 2d 513, 109 S. Ct. 480, the defendant's right to establish the alleged rape victim's motive to lie was found to override the Kentucky rape shield statute. The defendant there, who asserted the defense of consent, sought to introduce evidence of the alleged victim's relationship with another man, his theory being that the victim fabricated the story of the rape so as not to jeopardize her relationship with the other man.

No such defense theory was sought to be furthered by the confrontation sought at bar, however. The defense here sought strictly to damage the State's semen test evidence, which tended to show

that the defendant could not be excluded as the depositor of the semen, by presenting evidence of his own that the complainant had intercourse with another person or persons within the 72-hour time period prior to her encounter with the defendant. Evidence of the complainant's prior intercourse with another man, of which the State admitted it knew, would only have shown the existence of another member of the class to which the defendant already belonged (type O secretors), and would not have been relevant to the question of whether the admitted act of sexual penetration between the complainant and the defendant was consensual. *Cf. People v. Bell* (1991), 217 Ill. App. 3d 985 (defendant properly precluded from questioning 12-year-old alleged victim of aggravated criminal sexual assault regarding her sexual contact during prior three days for the purpose of (1) accounting for inconclusively tested semen found in victim's vagina; (2) establishing that some person other than him had assaulted her; and (3) completing his impeachment of her as to whether vaginal penetration occurred where the vaginal assault counts were dropped and the victim admitted prior inconsistency).

We conclude the court did not err in precluding such cross-examination of the complainant under the rape shield statute, although it would only have seemed fair to have allowed it in view of the irrelevant semen test evidence presented by the State. Two wrongs still do not make a right, however. In this regard, we note the defendant does not claim that the prosecutor's knowledge that the complainant did have intercourse with another person during the 72-hour time period prior to the act of sexual penetration at bar amounted to the presentation of perjured testimony or that the prosecutor knowingly misled the jury. Rather, defendant claims that the evidence itself was misleading, and it was "inappropriate" for the prosecutor to have presented it. We agree, but the record suggests the evidence was presented, somewhat routinely, in order to preclude the defense from being able to argue to the jury that, although a rape kit test was administered, the State did not present the test results. The availability of rape kit test evidence in sexual assault cases may be commonplace, but its admission must never be regarded as merely routine. Careful attention must be afforded its relevance under the particular facts of each case.

The defendant next contends that evidence concerning his conversation with the Aurora police and his subsequent failure to turn himself in for questioning was improperly presented. Specifically, Aurora police dispatcher Linda Adams was allowed to testify to a telephone conversation with the defendant in which he admitted that he had

been at the complainant's apartment, that he said nothing when asked if he realized he had hurt the complainant badly, and that he agreed to turn himself in. Defense counsel objected at trial to Adams' testimony on the basis that, although he knew Adams would testify that the defendant called the police, he was unaware that there was a 10- to 20-minute conversation.

It is unclear from the record whether counsel had any actual knowledge of what the substance of the conversation between the defendant and Adams was, and there is nothing in the State's written answer to discovery in the common-law record concerning the substance of the conversation. Defense counsel neither sought a continuance nor cross-examined Adams at trial. The prosecutor subsequently cross-examined the defendant on his failure to go to the Aurora police department even though the defendant knew they wanted to ask him some questions.

Neither the defendant nor the State notes that this issue was not raised in the defendant's otherwise detailed post-trial motion. Consequently, the defendant does not argue the matter should be noticed as plain error, nor do we see that it should, and the issue may be considered waived. *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

Assuming *arguendo* the State's actions with regard to this witness could be considered to be noncompliance with discovery requirements, such noncompliance does not require a reversal, absent a showing of prejudice (*People v. Schutz* (1990), 201 Ill. App. 3d 154), since the purpose of the rule requiring disclosure of statements made by the defendant is to prevent surprise and unfairness to the accused (*People v. Miller* (1989), 190 Ill. App. 3d 981).

■ Defense counsel never stated he was unaware of the substance of the conversation but only that he did not know the conversation had been as long as it was. Adams stated that she was "in and out of the conversation with Officer McQuinley, too" while she was talking with the defendant, and this may have accounted for the extended length of the conversation. Moreover, the jury was apprised that no charges were pending against the defendant at the time Adams conversed with him. Additionally, the defendant testified he started out to go to Aurora, but changed his mind and called the Aurora police department stating that he "wasn't coming."

A defendant waives the issue of an abuse of the court's discretion in allowing the introduction of evidence not disclosed by the State where, after the statement is admitted, he fails to request a continuance to investigate the statement or to impeach the witness regarding the statement. (*People v. Jastrzemski* (1990), 196 Ill. App. 3d 1037.)

The defendant here did not request a continuance and, in fact, conducted no cross-examination of Adams at all. Accordingly, we conclude that, in addition to waiving the error by failing to raise it in his post-trial motion, the defendant has failed to establish surprise or unfairness which prejudiced him.

The defendant's final contention is that his conviction of armed violence must be vacated and the cause remanded for resentencing because it was based on the same conduct as the aggravated criminal sexual assault offense, that is, the use of a knife and the stabbing of the complainant. As such, he argues, the less serious conviction of armed violence must be vacated. The State argues the armed-violence conviction need not be vacated where the complainant was stabbed twice, thus supporting two different offenses.

We agree. Under the one-act-one-crime principles announced in *People v. King* (1977), 66 Ill. 2d 551, multiple convictions and concurrent sentences are permitted in cases where a defendant has committed several acts, despite the interrelationship of those acts. (*King*, 66 Ill. 2d at 566.) Accordingly, convictions with concurrent sentences can be entered when a series of incidental or closely related acts occurs and each of those acts supports a different offense which is not a lesser included offense of the other.

The separate blows administered to a victim during the course of a beating by a defendant have been found to support the defendant's multiple convictions of and concurrent sentences for aggravated battery and mob action. (*People v. Dixon* (1982), 91 Ill. 2d 346, 355-56.) Similarly, multiple convictions of and concurrent sentences for armed violence, predicated on the possession of a controlled substance, and for possession of a controlled substance with intent to deliver were upheld where the intent-to-deliver element of the second offense was not included in the unlawful possession offense upon which the armed violence charge was predicated. (*People v. Green* (1990), 199 Ill. App. 3d 927.) It was determined there that the possession offenses could be based separately on the cocaine found in the defendant's left- and right-hand pockets, respectively. *Green*, 199 Ill. App. 3d at 932.

■ The instant armed violence charge was predicated on aggravated battery. An included offense of that armed violence charge would be battery, but the added element of criminal sexual assault in the aggravated criminal sexual assault offense here negatives any conclusion that that offense is an included offense of the armed violence charge. Moreover, as the State argues, the separate stab wounds inflicted on the complainant here cannot be distinguished from the multiple blows in *Dixon* or the separate pockets of cocaine

in *Green*. On the other hand, they do serve to distinguish the instant cause from the case relied on by the defendant, *People v. Olsen* (1987), 161 Ill. App. 3d 945, in which the defendant's conviction of armed violence, predicated on the use of nunchucks to inflict bodily harm on the victim, was vacated because his conviction of aggravated criminal sexual assault was based on the same forcible act. We conclude both of the defendant's convictions may stand.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

GEIGER and BOWMAN, JJ., concur.